Douglas R. Ricks, OSB #044026
VANDEN BOS & CHAPMAN, LLP
319 SW Washington St., Ste. 520
Portland, OR 97204
Telephone: 503-241-4869
Fax: 503-241-3731

    Of Attorneys for Sunshine Dairy Foods Management, LLC
    Debtors-in-Possession

Nicholas J. Henderson, OSB #074027
nhenderson@portlaw.com
MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor St., Suite 300
Portland, OR 97204
Telephone: (503) 417-0508
Facsimile: (503) 417-0528

    Of Attorneys for Karamanos Holdings, Inc.,
    Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Bankruptcy Case Nos. |
| Sunshine Dairy Foods Management, LLC and Karamanos Holdings, Inc., | 18-31644-pcm11 (Lead Case) |
| | 18-31646-pcm11 |
| | JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES |
| Debtors-in-Possession. | |

Debtors-in-Possession, Sunshine Dairy Foods Management, LLC ("Sunshine") and

Karamanos Holdings, Inc. ("Karamanos") (collectively "Debtors") move this Court for entry of

an order pursuant to 11 USC §§ 105(a) and 363 approving bidding procedures related to a

proposed sale of Debtors' East Plant assets, approving overbid protection, approving a

Page 1 of 13    JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES,
OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND
MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

Case 18-31644-pcm11   Doc 377   Filed 08/10/18

break-up fee and expense reimbursement for the initial bidder and approving the form and manner of notice of bidding procedures. In support of this motion, Debtor represents as follows:

1.     Debtors filed their voluntary Petitions under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on May 9, 2018 in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court"). The Debtors cases are jointly administered under case number 18-31644-pcm11.

2.     Debtors remain in possession of their assets and continue to operate their business as debtor-in-possession pursuant to § § 1107(a) and 1108 of the Bankruptcy Code.

3.     The relief requested herein by Debtors is based on the Court's authority pursuant to 11 USC § 105(a) and 11 USC § 363.

4.     Sunshine is a limited liability company headquartered in Portland, Multnomah County, Oregon. Karamanos is an Oregon corporation headquartered in Portland, Multnomah County, Oregon. Sunshine is in the business of manufacturing, packaging, and distributing dairy, non-dairy, and other related food products throughout the United States of America. The Debtors are the successor entities to the dairy delivery business founded in 1935 by John Karamanos.

5.     Debtors' operations have run at a deficit in recent years, due to changes in the dairy industry, a series of management changes, and a troubled rollout of a new set of accounting software. Notwithstanding Debtors' difficulties, Debtors continue to enjoy a unique position in the marketplace with a solid set of co-packing arrangements, an excellent

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

reputation for manufacturing, packaging, and distributing dairy, non-dairy, and other related food products, and a strong set of customer relationships.

6.     On May 8, 2018, Debtors employed Daniel J. Boverman as CRO to render turnaround management services in connection with the possible investment, sale, merger, consolidation, reorganization or other business combination, or similar transactions involving all or a substantial portion of the business or assets of the company, whether effected in one transaction or a series of transactions.

7.     Debtors, their representatives and professionals have contacted multiple potential investors, merger partners, and asset acquirers.  Debtors have entered into confidentiality agreements and provided due diligence access with respect to those parties interested in pursuing the matter.  Debtors have reviewed, considered and responded to various proposals and inquiries related to the potential purchase of Debtors' assets or post-petition financing convertible to equity.

8.     As a result of these contacts, Debtors received a Term Sheet to purchase substantially all of Debtors' assets, including real estate, related to the operation of the East Plant Facility from Lyrical Foods, Inc. ("Lyrical").  Debtors have determined, in the exercise of Debtors' business judgment, that the offer from Lyrical is the best offer received at this time with a likelihood of the transaction being successfully completed.

9.     On August 10, 2018, Debtors entered into the Asset Purchase Agreement with Lyrical ("APA").  A copy of the APA is attached hereto as **Exhibit 1** and incorporated herein by this reference.

10.    Debtors intend to sell the assets described in the APA (the "Acquired Assets") pursuant to a sale free and clear of all free and clear of all liens, claims, interests and

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

encumbrances in accordance with § 363 of the Bankruptcy Code with the opportunity for additional qualified parties to bid on the Acquired Assets at a time and place prior to the hearing on the sale. The bidding procedures set forth below are designed to comply with the APA and allow other interested parties an opportunity to bid.

11.     In order to induce Lyrical to enter into the APA, and in recognition of the costs incurred and to be incurred and efforts undertaken and to be undertaken in connection with the contemplated transactions, including due diligence investigation and legal and professional expenses incurred in negotiating and documenting the transaction, Debtors agreed to seek court approval of certain bidding procedures, overbid protections, expense reimbursements and break-up fees as set forth in the APA.

12.     Debtors request approval at this time of a break-up fee to Lyrical as an inducement for Lyrical being the Initial Bidder. If Lyrical is not approved by the Bankruptcy Court as the purchaser of the purchased assets by reason of the Debtors' consummation of an Alternative Transaction (as defined in the APA), then Lyrical seeks entitlement to receive from Debtors, in good funds payable upon the consummation of the sale of the assets to the overbidder, a payment in the amount of $150,000 (the "Break-up Fee"), plus an expense reimbursement in an amount of up to $75,000 (as defined in the APA, the "Expense Reimbursement"). Pursuant to the APA, the Break-up Fee and Expense Reimbursement will also constitute super-priority administrative expense claims pursuant to 11 USC § 503(b) and 507(a) against the Debtors.

13.     Debtors seek authority to implement the following bidding procedures and overbid protections:

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

a. <u>Initial Bid</u>.  The initial bid shall be the offer by Lyrical as set forth in **Exhibit 1** ("Initial Bid").  Lyrical is deemed a Qualified Bidder as defined below.

b. <u>Initial Deposit</u>.  The initial $560,000 deposit by Lyrical will be held in a segregated, interest-bearing account (the "Account") either: (i) in Vanden Bos & Chapman's trust account; (ii) in a segregated account opened by Debtors as Debtors-in-Possession; or (iii) at an escrow company approved by Debtors and Lyrical, and pursuant to escrow instructions reasonably acceptable to both Debtors and Lyrical.  The full amount of the deposit, and any interest thereon, will remain in the account until disbursed pursuant to the terms of the APA or further order of the Bankruptcy Court.

c. <u>Bidding Process</u>.  The Debtors shall have the right to (i) determine whether any person is a Qualified Bidder (as defined herein); (ii) coordinate the efforts of Qualified Bidders in conducting their respective due diligence reviews; (iii) receive offers from Qualified Bidders; (iv) notice all parties with respect to bidding procedures and the auction relating to the sale of the Acquired Assets (the "Auction") in accordance with this Motion; and (v) evaluate and negotiate any bid (collectively the "Bidding Process").

d. <u>Alternative Transactions</u>.  Debtors may consider a bid proposing a transaction other than a sale as set forth on **Exhibit 1** so long as such bid (i) proposes a transaction that would close substantially in the same time frame as the Initial Bid; and (ii) is not subject to or conditioned upon any financing contingencies or the outcome of due diligence.  Debtors reserve the right to aggregate separate bids in determining whether one or more of

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

a combination of bids, in the aggregate, constitute a higher or otherwise better offer.

e.  <u>Reservation of Rights</u>.  Debtors may determine, in their business judgment, which Qualified Bid (as defined herein), if any, is the highest or otherwise best offer, and reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that, in Debtors' sole discretion, is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code or bidding procedures; or (iii) contrary to the best interests of Debtors, Debtors' estates and creditors.  Debtors shall retain all rights to property of the estates that is not subject to a bid accepted by Debtors and approved by the Bankruptcy Court at the hearing to approve the successful bidder.  Debtors reserve the right to withdraw this Motion and/or the sale of all or any of Debtors' assets, at any time prior to court approval without liability to Debtors except with respect to the Break-Up Fee and Expense Reimbursement or as otherwise provided by Court order.

f.  <u>Due Diligence</u>.  Unless a specific exception is granted by Debtors in Debtors' sole discretion, each bidder must complete all required due diligence prior to the submission of its bid.  Debtors will provide due diligence information to potential bidders who so request by contacting Debtors' CRO, Daniel J. Boverman, Boverman & Associates, LLC, 11285 SW Walker Rd., Portland, OR 97225 or by telephone at (503) 627-9905 (e-mail contact also available upon request).  Debtors may also designate an employee or other representative of Debtors to coordinate all reasonable

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

requests for due diligence access from potential bidders.  Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below) or to any person that Debtors determine is not reasonably likely to be a Qualified Bidder.  Bidders will have access to certain confidential information of the Debtor only upon execution of a confidentiality agreement in a form satisfactory to Debtors.

g.  <u>Qualified Bidder</u>.  On or before seven (7) days prior to the Auction Date (as defined below) a potential bidder must deliver the following documents and information to Debtors to be considered a "Qualified Bidder" and be entitled to bid at the Auction Date.

- A certified check, representing a good faith deposit (the "Deposit"), in the amount of the greater of $607,500 and 10% of the gross purchase price in the offer made by the Qualified Bidder, payable to the order of Estate of Sunshine Dairy Foods Management, LLC.

- Written evidence of a commitment for financing or other evidence of the bidder's ability to consummate the applicable transaction and perform under the Marked Agreements, which shall include current audited financial statements of the bidder or, if the bidder is an entity formed for the purpose of entering into the proposed transaction, current audited financial statements of the equity holder(s) of the bidder and those entities who shall guaranty the performance of such bidder, and such

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

other form of financial information requested by Debtors and
Debtors' advisors.

- Each bid must fully disclose the identity of each entity that will be
  participating in such bid and the name of any affiliates, insiders,
  or former insiders of the Debtors that participated in submitting
  the bid, including any proposed designee(s).  Further, each bid
  must provide sufficient financial and other information regarding
  both the bidder and all other parties participating in the bid to
  satisfy the Debtors with respect to the requirements enumerated
  in §§ 363(m), 365(b), and 365(f)(2) of the Bankruptcy Code or as
  otherwise required by Debtors.

- Written evidence that the bidder has obtained authorization and
  approval from its board of directors (or comparable governing
  body) with respect to the submission of its bid and execution and
  delivery of its Marked Agreements, or a representation that no
  such authorization and approval is required.

h. <u>Qualified Bid</u>.  To constitute a "Qualified Bid" the proposal must be made
by a Qualified Bidder and:

- A copy of the APA with Lyrical marked to show changes that
  such bidder would require to consummate the transaction
  including the list of assets to be purchased (the "Marked
  Agreements"). The Marked Agreements must be on terms that,
  in Debtors' business judgment, are equal or more favorable to

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES,
OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND
MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

the Debtors than those set forth in the Initial Bid and be executed by and binding upon the bidder.

- A completed list of executory contracts and unexpired leases to be assumed and assigned, which must include all executory contracts and unexpired leases to be assumed and assigned to Lyrical pursuant the APA, and verification that purchaser will cure all amounts required to be paid in accordance therewith pursuant to 11 UCS § 365 required to be paid by Debtors or purchaser.

- Provide information satisfactory to Debtors that the bidder shall be able to consummate the proposed transaction if selected as the successful bidder;

- Not be subject to or conditioned upon any financing contingencies;

- Not be conditioned upon the outcome of due diligence;

- Be binding on each entity or partner participating in the bid;

- Not request or entitle the bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment other than the Initial Bidder;

- Provide for the closing of such transaction substantially in the same time frame proposed in the Initial Bid;

- Be in an amount equal to or in excess of the amount required for an Initial Overbid (as defined below); and

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

- The deadline to receive bids is **September 10, 2018** ("Bid Deadline").

i. <u>Auction</u>. After the Bid Deadline, Debtors shall review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the transaction process, including those factors affecting the speed and certainty of consummating the proposed transaction. Debtors shall provide Lyrical with copies of all competing bids within two (2) business days after receipt. After all bids have been reviewed, Debtors may conduct an auction (the "Auction") with respect to the sale of the Acquired Assets. Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction. Based upon the terms of the Qualified Bids received, the level of interest expressed at the Auction, and/or such other information as the Debtors may determine, Debtors may conduct an Auction on terms designed to achieve the maximum value of Debtors' assets including, but not limited to, those terms set forth below. Upon conclusion of the Auction, or, if Debtors determine an Auction is not necessary or appropriate, then promptly following the Bid Deadline, Debtors, in consultation with Debtors' advisors, shall identify the highest or otherwise best Qualified Bid. If no Qualified Bids are received from any Qualified Bidders, the Auction may not take place and Debtors may immediately seek Bankruptcy Court approval of the sale of the assets to Lyrical.

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

j.  Date, Time and Place of Auction.  The Auction shall take place at the

offices of Motschenbacher & Blattner, LLP, 117 SW Taylor St., Ste. 300,

Portland, OR  97204 beginning at 10:00 A.M. Pacific Standard Time on

**September 13, 2018** ("Auction Date").  If necessary for logistical reasons,

the place of the Auction may be changed upon 24 hours' notice to all

Qualified Bidders.

k.  Bidding Process.  Subject to revision by Debtor prior to the commencement

of the Auction, the proposed bidding procedure is as follows:  The

minimum opening bid from any Qualified Bidder must (a) include a cash

purchase price that is at least $475,000 greater than the cash purchase

price set forth in the APA, and (b) must include total consideration,

including all cash, non-cash consideration and assumed liabilities, that is at

least $475,000 greater than in the APA ("Initial Overbid").  After any Initial

Overbid, all further overbids must be in increments of $250,000 net value

to Debtors.  If an Initial Overbid is received, any other Qualified Bidder and

Lyrical shall have the right, but not the obligation, to participate in the

Auction.  Bidding shall be conducted in successive rounds.  Bidding rounds

shall continue until no participant has made a bid during a bidding round,

whereupon the last and highest bid at the close of the immediately

preceding bidding round shall be deemed the successful bidder.

l.  Court Approval and Closing.  Debtors presently intend to seek Court

approval of the sale on **September 17, 2018** of the highest or otherwise

best Qualified Bid received.  Debtors' presentation to the Bankruptcy Court

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES,
OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND
MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

for approval of a particular Qualified Bid does not constitute Debtors' acceptance of the bid. Debtors have accepted a bid only when the bid has been approved by the Bankruptcy Court ("Successful Bidder"). The second highest or otherwise best Qualified Bid submitted by the Bid Deadline (as modified by a Qualified Bidder at the Auction) shall remain open and irrevocable through the consummation of the final agreements and closing of the sale with the Successful Bidder. The sale to the Successful Bidder as approved by an Order of the Bankruptcy Court will be consummated within five business days after all conditions precedent are satisfied or waived including a Court Order Authorizing the Sale ("Closing Date"). **The anticipated Closing Date will occur on or before September 28, 2018.**

14.     Subsequent to the filing of this Motion, Debtors will file a Notice of Intent to sell property and a notice and motion approving assumption and assignment of executory contracts to the Successful Bidder. Given that by the time the hearing on the Bidding Procedures is conducted, Debtors will already have served the Notices of Intent on the entire mailing matrix, Debtors believe that service of the Notice of Bidding Procedures can be limited to service upon: (i) the United States Trustee for the District of Oregon, (ii) counsel to the Official Committee of Unsecured Creditors, (iii) Debtors' secured creditors and their counsel, (iv) counsel to the Initial Bidder, (v) the Internal Revenue Service, (vi) the Oregon Department of Revenue, (vii) the Securities and Exchange Commission, (viii) the US Attorney's Office, (ix) those parties having filed a notice of appearance and request for special notice pursuant to FRBP 2002, (x) those parties having expressed a bona fide

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

interest in entering into a proposed transaction with Debtors for the sale of Debtors' assets or an investment in Debtors, and (xi) all non-debtor parties to executory contracts and leases, and (xii) any other party that may express an interest in bidding on Debtors' assets.

15.     A paramount goal of any proposed sale or use of property of the bankruptcy estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize procedures intended to enhance competitive bidding that are consistent with the goal of maximizing value received by the estate and therefore appropriate in the context of bankruptcy sales.  Debtors believe the proposed bidding procedures, overbid protections, expense reimbursement and break-up fee set forth herein are fair, reasonable, necessary and appropriate in order to facilitate the prompt and efficient sale of the Acquired Assets.

WHEREFORE, Debtors request that this Court enter an order approving the bidding procedures, overbid protection, expense reimbursement, and break-up fee requested herein, and provide that notice of the bidding procedures shall be provided to those parties as set forth above.

DATED: <u>08/10/18</u>

MOTSCHENBACHER & BLATTNER LLP          VANDEN BOS & CHAPMAN, LLP


By:<u>/s/Nicholas J. Henderson</u>          By:<u>/s/Douglas R. Ricks</u>
   Nicholas J. Henderson, OSB #074027          Douglas R. Ricks, OSB #044026
   Of Attorneys for Debtor-in-Possession          Of Attorneys for Debtor-in-Possession
   Karamanos Holdings, Inc.          Sunshine Dairy Foods Management, LLC

JOINT MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

ASSET PURCHASE AGREEMENT

BY AND AMONG

LYRICAL FOODS, INC.

as Purchaser,

and

SUNSHINE DAIRY FOODS MANAGEMENT, LLC and KARAMANOS HOLDINGS, INC.

as Sellers

Dated as of August 10, 2018

**EXHIBIT 1 - PAGE 1 OF 49**

Case 18-31644-pcm11   Doc 377   Filed 08/10/18

# TABLE OF CONTENTS

Page

ARTICLE I.

DEFINITIONS..................................................................................1
1.1    Certain Definitions ...................................................................1

ARTICLE II.

ACQUISITION AND TRANSFER OF ASSETS; ASSUMPTION
OF LIABILITIES....................................................................8
2.1    Transfer of Assets. ....................................................................8
2.2    Excluded Assets .........................................................................8
2.3    Assumed Liabilities ...................................................................8
2.4    Excluded Liabilities ...................................................................8
2.5    Assumed Executory Contracts...................................................8
2.6    Liens and Encumbrances ...........................................................9

ARTICLE III.

CONSIDERATION ............................................................................9
3.1    Consideration..............................................................................9
3.2    Payment of Purchase Price at Closing .......................................9
3.3    Assumed Liabilities ...................................................................9
3.4    Allocation of Consideration.......................................................9
3.5    Deposit .....................................................................................10
3.6    Alteration and Amendment of Exhibits; Cure Costs..................10

ARTICLE IV.

CLOSING AND TERMINATION ......................................................10
4.1    Closing.  ...................................................................................10
4.2    Conveyances at Closing............................................................11
4.3    Additional Deliveries ...............................................................11
4.4    Transaction Expenses ...............................................................12
4.5    Prorations. ................................................................................12
4.6    Termination of Agreement .......................................................12
4.7    Procedure Upon Termination ...................................................13
4.8    Effect of Termination ...............................................................13

- i -

**EXHIBIT 1 - PAGE 2 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF SELLERS ..................14
5.1   Organization and Power. .................................................................14
5.2   Corporate Authorization. ................................................................14
5.3   Binding Effect ................................................................................14
5.4   Ownership of Acquired Assets ......................................................14
5.5   Finders' Fees .................................................................................15
5.6   No Other Representations or Warranties .......................................15

ARTICLE VI.

REPRESENTATIONS AND WARRANTIES OF PURCHASER ............15
6.1   Organization and Power ................................................................15
6.2   Authorization .................................................................................15
6.3   Binding Effect ................................................................................15
6.4   Funding .........................................................................................15
6.5   Adequate Assurances Regarding Assumed Executory Contracts ..................16
6.6   Finders' Fees .................................................................................16
6.7   Good Faith Purchaser. ...................................................................16
6.8   Purchaser Experience ....................................................................16

ARTICLE VII.

CERTAIN COVENANTS .................................................................16
7.1   Bankruptcy Sale Process. ...............................................................16
7.2   Stalking Horse Provisions. .............................................................17
7.3   Pre-Closing Operating Covenants of Sellers. .................................18
7.4   Access to Information. ....................................................................19
7.5   Reasonable Efforts; Further Assurances of Each Party ...................20
7.6   Regulatory Affairs ........................................................................20

ARTICLE VIII.

CONDITIONS TO CLOSING ............................................................20
8.1   Conditions Precedent to the Obligations of Sellers and Purchaser ..................20
8.2   Conditions Precedent to the Obligations of Sellers ........................21
8.3   Conditions Precedent to the Obligations of Purchaser ...................21

ARTICLE IX.

MISCELLANEOUS ....................................................................22

9.1     Transfer Taxes ....................................................................22

9.2     Releases ....................................................................22

9.3     Survival. ....................................................................22

9.4     Injunctive Relief ....................................................................23

9.5     Entire Agreement; Amendments and Waivers ....................................................................23

9.6     Counterparts; Electronic Signatures ....................................................................23

9.7     Governing Law ....................................................................23

9.8     Waiver of Jury Trial. ....................................................................24

9.9     Notices. ....................................................................24

9.10    Binding Effect; Assignment ....................................................................25

9.11    Third Party Beneficiaries ....................................................................26

9.12    Publicity.. ....................................................................26

9.13    Severability ....................................................................26

9.14    Time of the Essence ....................................................................26

9.15    Obligations of Parties ....................................................................26

9.16    Miscellaneous. ....................................................................26

## EXHIBITS

Exhibit  A               Acquired Assets
Exhibit  B               Assumed Executory Contracts
Exhibit  C               Assumed Liabilities
Exhibit  D               Employees
Exhibit  E               Bill of Sale
Exhibit  F               Form of Assignment and Assumption Agreement

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of August 10, 2018 (the "Execution Date"), is made and entered into by and among LYRICAL FOODS, INC., a Delaware corporation ("Purchaser"), SUNSHINE DAIRY FOODS MANAGEMENT, LLC, an Oregon limited liability company and KARAMANOS HOLDINGS, INC, an Oregon corporation (each a "Seller", and collectively "Sellers").  Certain capitalized terms used herein are defined in Article I.

## RECITALS

WHEREAS, on May 9, 2018, Sellers commenced jointly-administered cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court"); and

WHEREAS, Purchaser desires to acquire certain assets of Sellers identified herein, and Sellers desire to sell, convey, assign, and transfer to Purchaser such assets pursuant to the terms and conditions  of this Agreement; and

WHEREAS, it is intended that the Acquired Assets (defined below), will be sold and purchased pursuant to the terms of this Agreement in a sale authorized by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code; and

WHEREAS, it is intended that the Bankruptcy Court shall approve the assumption and assignment of certain Executory Contracts (defined below) under section 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

1.1     Certain Definitions.  For purposes of this Agreement, the following terms used in this Agreement shall have the respective meanings assigned to them below:

(a)     "Accounts Receivable" means (i) any and all accounts receivable, trade accounts and other amounts (including overdue accounts receivable) owed to Sellers relating to, or arising in connection with the operation and conduct of, the Business and any other similar rights of Sellers to payment from third parties and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services rendered, in each case owing to Sellers; (ii) all other accounts or notes receivable of Sellers and the full benefit of all security for such accounts or notes receivable; and (iii) any and all claims, remedies

**EXHIBIT 1 - PAGE 5 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

(b)     "Acquired Assets" means, all right, title and interest of Sellers in certain of their assets, including the Acquired Property, set forth in Exhibit A hereto, which excludes all right, title and interest of Sellers in the Excluded Assets.

(c)     "Acquired Property" means that certain property located at 8440 NE Halsey Street, Portland, Oregon 97220.

(d)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(e)     "Alternative Transaction" means a sale, transfer or other disposition of all or any substantial portion of the Acquired Assets to any person or entity (or persons or entities) other than Purchaser, in any transaction or series of transactions.

(f)     "Assumed Executory Contracts" means the Executory Contracts assumed by and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code in accordance with the Bidding Procedures, set forth in Exhibit B hereto.

(g)     "Assumed Liabilities" means, only those liabilities expressly set forth on Exhibit C hereto, which include the Assumed Executory Contracts.

(h)     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

(i)     "Bidding Procedures" means the procedures governing the submission, evaluation and qualification of competing bids on the Acquired Assets, and the auction among qualified bidders for the purchase of the Acquired Assets, as described in the Bidding Procedures Order.

(j)     "Bidding Procedures Order" means an order of the Bankruptcy Court, reasonably satisfactory in form and substance to Sellers, Purchaser and their respective counsel, approving the sale process described in the Sale Motion and the Bidding Procedures, including, without limitation, the Stalking Horse Provisions.

(k)     "Break Fee" means that amount payable pursuant to Section 7.2(b) as liquidated damages, and not as a penalty, in the amount of $150,000.

(l)     "Business" means the business of operating a dairy and dairy substitute processing, manufacturing and co-packing business at the Acquired Property.

2

**EXHIBIT 1 - PAGE 6 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

(m) "Business Day" means any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of Oregon are not required to open.

(n) "Cash and Cash Equivalents" means all of Sellers' cash (including petty cash but excluding any checks that remain uncashed or uncleared prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper and government securities and other cash equivalents.

(o) "Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

(p) "Contract" means any written or oral contract, lease, purchase order, service order, sales order, or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property, and any amendments, modifications or supplements thereto.

(q) "Cure Costs" means all costs required to pay all amounts, obligations and liabilities accrued, due and to become due and all costs and other obligations required to cure all defaults that may exist under any Assumed Executory Contract as of the Closing Date or that may arise after the Closing Date based on the occurrence of an event that occurred prior to the Closing Date.

(r) "Deposit" shall mean the good-faith deposit in the amount of 10% of the Cash Purchase Price (defined below) deposited by Purchaser on or prior to August 20, 2018, in an account to be determined by Sellers and Purchaser.

(s) "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to, used in, or held for use in connection with the Business or any of the Acquired Assets, in each case whether or not in electronic form.

(t) "Encumbrance" means any lien, encumbrance, Claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, condition, restriction, encroachment, rights of first refusal, preemptive right, judgment, conditional sale or other title retention agreements and other imposition, imperfection or defect of title or restriction on transfer or use of any nature whatsoever, whether secured

3

EXHIBIT 1 - PAGE 7 OF 49

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

or unsecured, choate or inchoate, filed or untiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

(u) "Excluded Assets" means (i) Cash and Cash Equivalents and (ii) Account Receivables of the Sellers, but only to the extent that such Accounts Receivable are based solely on actions of Sellers prior to the Closing Date and if such Accounts Receivable are fully accrued and vested as of the Closing Date, with no further condition precedent to any obligation thereon, and (iii) those other assets and properties of Sellers that are not included in the Acquired Assets.

(v) "Excluded Liabilities" means those liens, Claims, interests, Encumbrances or Liabilities of Sellers or related to the Acquired Assets or any other assets of Sellers, whether actual or contingent, accrued or unaccrued, matured or unmatured, liquidated or unliquidated, or known or unknown, that are not the Assumed Liabilities set forth on Exhibit C hereto, and which shall include (i) any employment related obligations, except to the extent such liabilities arise after the Closing under an Assumed Executory Contract, (ii) any liabilities to customers or end users on account of any products of Sellers or otherwise, whether products liability claims, warranty or defect claims, successor liability claims, or otherwise, and (iii) any liabilities of the Sellers with respect to any pension plan or the Employee Retirement Income Security Act of 1974.

(w) "Executory Contracts" means all executory contracts (including licenses) and unexpired leases in effect as of the date hereof to which Sellers is a party.

(x) "Expense Reimbursement" shall have the meaning set forth in Section 7.2.

(y) "Final Order" means an Order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Sellers' Chapter 11 Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of *certiorari,* new trial, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such Order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause such Order not to be a Final Order.

4

**EXHIBIT 1 - PAGE 8 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

(z)     "Final Sale Notice" means a notice distributed in accordance with the Bidding Procedures regarding the transactions contemplated by this Agreement and the Sale Order.

(aa)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state, provincial or local, or any ministry agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) or any judicial, quasi-judicial or administrative body, or any regulatory body of applicable jurisdiction

(bb)    "Intellectual Property" shall mean the following subsisting throughout the world: Patent Rights; Trademarks and all goodwill in the Trademarks; copyrights, designs, data and database rights and registrations and applications for registration thereof, including moral rights of authors; mask works and registrations and applications for registration thereof; inventions, invention disclosures, statutory invention registrations, trade secrets and confidential business information, know-how, manufacturing and product processes and techniques, research and development information, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, whether patentable or nonpatentable, whether copyrightable or noncopyrightable and whether or not reduced to practice; and other proprietary rights relating to any of the foregoing (including remedies against infringement thereof and rights of protection of interest therein under the laws of all jurisdictions).

(cc)    "Key Employees" means those employees of the Sellers designated by Purchaser and as listed on Schedule 1 to Exhibit D hereto, which may be amended from time to time prior to the Closing Date by Purchaser, but such amendments may only remove employees from Schedule 1 to Exhibit D, not substitute or add employees.

(dd)    "Laws" (and each, a "Law") means all federal, state, provincial, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, Orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies, or court of competent jurisdiction, or other legal requirement or rule of law, including common law.

(ee)    "Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

(ff)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent,

5

**EXHIBIT 1 - PAGE 9 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

direct or indirect, joint or several, accrued or unaccrued, liquidated or unliquidated, or due or to become due, including all costs and expenses relating thereto.

(gg) "Notice of Proposed Assumed Executory Contracts" means a notice filed by Sellers with the Bankruptcy Court in accordance with the Bidding Procedures identifying the Executory Contracts Purchaser intends to assume as of the Closing Date, which notice may be amended pursuant to Section 2.5(a) and Section 3.6.

(hh) "Order" means any order, writ, judgment, injunction, decree, stipulation, determination, decision, verdict, ruling, subpoena, or award entered by or with any governmental authority (whether temporary, preliminary or permanent).

(ii) "Other Employees" means those employees of the Sellers designated by Purchaser and as listed on Schedule 2 to Exhibit D hereto, which may be amended from time to time prior to the Closing Date by Purchaser.

(jj) "Patent Rights" shall mean all patents, patent applications, utility models, design registrations and certificates of invention and other governmental grants for the protection of inventions or industrial designs (including all related continuations, continuations-in-part, divisionals, reissues and reexaminations).

(kk) "Permits" means all licenses, permits (including environmental, construction and operation permits), provider numbers, franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, orders and other similar documents and authorizations issued by any Governmental Body and/or any self-regulatory body or organization to or for the benefit of Sellers and used, or held for use, in connection with the operation of the Business or applicable to ownership of the Acquired Assets or assumption of the Assumed Liabilities.

(ll) "Permitted Encumbrance" means, collectively, all of the following: (a) applicable zoning, subdivision, building and other land use laws and regulations; (b) all matters, whether or not of record, that arise out of the actions of Purchasers or Purchaser's agents; (c) all matters that a title insurer is willing to insure over without additional premium or indemnity and which do not have a material adverse impact on the ownership, operation or value of the Acquired Property; (d) all matters shown on or referenced in a title insurance commitment or otherwise of record as of the Execution Date; and (e) all matters shown on a current boundary survey of the Acquired Property or such state of facts as would be disclosed by a physical inspection of the Acquired Property as of the Execution Date.

(mm) "Person" means an individual, corporation, partnership, limited liability company, unlimited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(nn) "Petition Date" means the date Sellers commenced their Chapter 11 Cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

6

**EXHIBIT 1 - PAGE 10 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

(oo) "Regulatory Approvals" means any consents, waivers, approvals, Orders, Permits or authorizations of any Governmental Body required in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereunder.

(pp) "Sale Hearing" means the hearing before the Bankruptcy Court to approve this Agreement and seeking entry of the Sale Order.

(qq) "Sale Motion" means a motion of the Sellers, filed in the Bankruptcy Court, reasonably satisfactory in form and substance to the Sellers, Purchaser, and their respective counsel, seeking approval of the Bidding Procedures, the Stalking Horse Provisions, this Agreement and the transactions contemplated herein, and entry of the Bidding Procedures Order and Sale Order.

(rr) "Sale Order" means an order of the Bankruptcy Court, satisfactory in form and substance to Purchaser, (a) approving this Agreement and the transactions contemplated herein, including, without limitation, the sale of the Acquired Assets free and clear of all liens, Claims, interests and Encumbrances, including those relating to mortgages, Taxes (other than Transfer Taxes), warranty, products liability, successor liability, environmental obligations or liabilities (including under the Comprehensive Environmental Response, Compensation, and Liability Act), pensions or under the Employee Retirement Income Security Act of 1974, (b) the assumption and assignment of all Assumed Executory Contracts, and (c) including, without limitation, a finding that Purchaser has acted in good faith and is entitled to the protections of section 363(m) of the Bankruptcy Code.

(ss) "Stalking Horse Provisions" means the Break Fee, the Expense Reimbursement, and the other provisions described in Section 7.2 of this Agreement.

(tt) "Subsidiary" means, with respect to any Person, (a) any other Person that directly, or indirectly through one or more intermediaries, is controlled by such Person; or (b) any other Person where a majority of its equity interests are held, directly, or indirectly through one or more intermediaries, by such Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlling" and "controlled") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(uu) "Tax" and "Taxes" mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Laws or Governmental Body, and including any interest, penalties or additional amounts attributable to, imposed upon, or with respect thereto.

(vv) "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including attachments thereto and amendments thereof.

7

**EXHIBIT 1 - PAGE 11 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

(ww)  "Third Party" means any Person that is not a party hereto or an Affiliate or a party hereto.

(xx)  "Trademarks" shall mean all trademarks and service marks, logos, trade dress, Internet domain names, corporate names and doing business designations and all registrations and applications for registration of the foregoing.

(yy)  "Transaction Documents" means any and all such instruments required to effectuate the transactions contemplated by this Agreement.

## ARTICLE II.

## ACQUISITION AND TRANSFER OF ASSETS; ASSUMPTION OF LIABILITIES

2.1  Transfer of Assets.  Subject to approval of the Bankruptcy Court, and upon the terms and subject to the conditions and provisions contained herein, at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall acquire and accept from Sellers, the Acquired Assets, subject to all Assumed Liabilities and Permitted Encumbrances, otherwise free and clear of all liens, Claims, interests, Encumbrances and Excluded Liabilities, subject to Section 2.4 below.  Notwithstanding anything to the contrary, the Acquired Assets shall not include any of the Excluded Assets.

2.2  Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Acquired Assets shall not include, and Sellers shall retain, all of their right, title and interest in and to, and shall not sell, convey, transfer, assign or deliver to Purchaser any of the Excluded Assets.

2.3  Assumed Liabilities.  At the Closing, Purchaser shall assume and have sole responsibility for the Assumed Liabilities.

2.4  Excluded Liabilities.  For the avoidance of doubt, notwithstanding any other terms, provisions and conditions of this Agreement, Purchaser shall not assume, or otherwise be responsible or liable for, the Excluded Liabilities.

2.5  Assumed Executory Contracts.  To the maximum extent permitted by the Bankruptcy Code and in accordance with the Bidding Procedures, each Assumed Executory Contract shall be assumed by and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code as of the later of: (a) if no objection is filed by the Closing Date to the Notice of Proposed Assumed Executory Contracts, the Closing Date, or (b) if an objection is filed by the Closing Date to the Notice of Proposed Assumed Executory Contracts, the date such assumption and assignment is approved by an Order of the Bankruptcy Court.

(a)  Subject to Section 3.6 hereof, on or before the Closing Date, Purchaser may, at any time and for any reason, in its sole discretion, elect to remove any Executory Contract from Exhibit B, in which case such Executory Contract shall not be an Assumed Executory Contract; provided, however, any Executory Contract removed from Exhibit B on account of an objection to the proposed assumption by and assignment of such Executory Contract to Purchaser may be subsequently added to Exhibit B and

8

**EXHIBIT 1 - PAGE 12 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

will be deemed an Assumed Executory Contract once such objection is resolved and such Executory Contract is assumed by and assigned to Purchaser.

(b)      Sellers shall be responsible and liable for, and shall pay all Cure Costs from the Cash Purchase Price (or, in the alternative, shall agree with Purchaser that Purchaser shall pay Cure Costs directly and deduct the amount of such paid Cure Costs from the Cash Purchase Price otherwise payable to Sellers) in accordance with Section 3.2 and Section 3.6.

2.6      _Liens and Encumbrances_.  Any liens, except for the Permitted Encumbrances, on the Acquired Assets existing as of the Closing Date will attach to the proceeds from the sale of the Acquired Assets according to such liens' relative priorities.

## ARTICLE III.

## CONSIDERATION

3.1      _Consideration_.  The aggregate consideration (collectively, the "Purchase Price") to be paid for the acquisition of the Acquired Assets shall consist of the following, which shall be payable in accordance with the terms and conditions set forth in this Article III and Article IV: an amount in cash equal to $5,600,000 (the "Cash Purchase Price"), which Cash Purchase Price shall be net of (i) the Deposit provided by Purchaser in accordance with Section 3.4; _plus_ (ii) assumption of all other Assumed Liabilities set forth in Exhibit C; _plus_ or _minus_ (as applicable) (iii) any adjustments for prorations pursuant to Section 4.5.

3.2      _Payment of Purchase Price at Closing_.  The Purchase Price as described in Section 3.1 shall be satisfied at the Closing, subject to the terms and conditions contained in this Article III and Article IV.

3.3      _Assumed Liabilities_.  Purchaser shall assume the Assumed Liabilities pursuant to the assignment and assumption agreement substantially in the form attached hereto as Exhibit F (the "Assignment and Assumption Agreement").

3.4      _Allocation of Consideration_.  Within thirty (30) calendar days after the Closing Date, Purchaser shall deliver to Sellers a statement setting forth the allocation of the Purchase Price among the Acquired Assets.  Purchaser and Sellers shall use commercially reasonable efforts to promptly agree on such allocation of the deemed sales price of the Acquired Assets, in accordance with the allocation requirements of Section 1060 of the Internal Revenue Code (the allocation agreed on by the parties pursuant to this Section, the "Allocation"). If Purchaser and Sellers are unable to agree on the Allocation within twenty (20) days after delivery of the initial allocation, then the Parties shall submit the matter for resolution by the Bankruptcy Court.  Such Allocation shall become part of this Agreement for all purposes.  Sellers and Purchaser agree to report, pursuant to section 1060 of the Internal Revenue Code of 1986 and the regulations promulgated thereunder, if and when required, the Allocation of the Purchase Price, as adjusted, in a manner entirely consistent with such Allocation in the preparation and filing of all Tax Returns (including IRS form 8594).  Neither Sellers nor Purchaser shall take any action that would call into question the bona fide nature of such Allocation; and none of the parties shall

take any position for Tax purposes which is inconsistent with such Allocation, unless required to do so under applicable law.  Notwithstanding the foregoing, the Allocation shall not be binding upon any person or entity that is not a party to this Agreement

3.5     Deposit.  Purchaser has provided the Deposit in good faith.  If the Closing occurs, the Deposit shall be paid to Sellers and applied against the Cash Purchase Price at the Closing as described in Section 3.2.  If the Closing does not occur, then the Deposit shall be disbursed as follows: (i) in the event of a termination of this Agreement for any reason other than breach by Purchaser as a result of Purchaser's failure to perform its obligations at Closing notwithstanding that all conditions to such performance have been satisfied, the Deposit shall be returned to Purchaser; or (ii) in the event of a termination of this Agreement and the Deposit has not been disbursed in accordance with clauses (i) or (ii) of this Section 3.5, then the Deposit shall be disbursed as any court of competent jurisdiction may direct.  Purchaser and Sellers shall cooperate to select or establish an account designated to hold the Deposit prior to its disbursement, and to implement the provisions of this Section 3.5.

3.6     Alteration and Amendment of Exhibits; Cure Costs.  Notwithstanding anything to the contrary contained in this Agreement, Purchaser may, by notice to Sellers, at any time on or before the Closing Date, in its sole discretion: (a) alter or amend Exhibit A to this Agreement by removing an Acquired Asset, and (b) add any Executory Contract to Exhibit B to this Agreement, provided, however, Sellers or Purchaser (as determined in accordance with Section 2.5(b) hereof) shall pay the Cure Costs associated with all Assumed Executory Contracts listed on Exhibit B as of the Closing Date up to an aggregate amount not to exceed $1,000,000; provided, further, to the extent an objection is filed by the Closing Date to the Notice of Proposed Assumed Executory Contracts concerning an Executory Contract listed on Exhibit B as of the Closing Date, such Executory Contract may be removed from Exhibit B on the Closing Date and Purchaser shall not be obligated to pay any Cure Costs in respect of such Executory Contract unless and until such objection is resolved and such Executory Contract is assumed by and assigned to Purchaser, subject to the limitation Purchaser's liability on aggregate Cure Costs set forth above in Section 3.6(b).  Subject to Section 9.5, the Exhibits to this Agreement, as they may have been amended by Purchaser in accordance with the immediately preceding sentence or as otherwise permitted by this Agreement, shall constitute the Exhibits as of any applicable date.

**ARTICLE IV.**

**CLOSING AND TERMINATION**

4.1     Closing.    Provided that the conditions to closing set forth herein have been satisfied or, if waivable, have been waived in accordance herewith, the closing of the transactions contemplated herein (the "Closing") shall be held at such place as agreed to between Purchaser and Sellers, within three (3) calendar days following the first day that all such conditions have been satisfied or, if waivable, waived, on a Business Day mutually agreeable to Purchaser and Sellers.  The date on which the Closing occurs in accordance with the previous sentence is referred to as the "Closing Date".  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Sellers in the Acquired Assets to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser

10

**EXHIBIT 1 - PAGE 14 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

and the assumption of all of the Assumed Liabilities shall be considered to have occurred as of 12:01 a.m. Pacific Time on the Closing Date.

4.2    Conveyances at Closing.    At the Closing, Sellers and Purchaser shall take the following actions:

(a)    Purchaser shall pay to Sellers, by wire transfer to one or more accounts designated by Sellers, in immediately available funds, the Purchase Price as set forth in Section 3.1, less any net amount owing by Sellers pursuant to Section 4.5 of this Agreement;

(b)    Sellers shall deliver to Purchaser possession of the Acquired Assets;

(c)    Sellers shall deliver to Purchaser a duly executed bill of sale with respect to the Acquired Assets, substantially in the form attached hereto as Exhibit E (the "Bill of Sale") and any other documents described in Section 8.3 hereof, to the extent not already delivered;

(d)    Sellers shall deliver to Purchaser a duly executed bargain and sale deed with respect to the real estate comprising part of the Acquired Assets, in a form to be mutually agreed upon by the parties on or before August 20, 2018 (the "Bargain and Sale Deed");

(e)    Sellers shall provide to Purchaser all such other duly executed instruments as Purchaser may reasonably require to effectuate the transfer, assignment and conveyance of the Acquired Assets, including the Acquired Property;

(f)    Sellers shall deliver to Purchaser a duly executed consent by First Business Capital Corp., as mortgagee of the Acquired Property, in a form acceptable to Purchaser, that approves the sale of the Acquired Property free and clear of all Encumbrances, including any Encumbrances or interests First Business Capital Corp. has with respect to the Acquired Property;

(g)    Sellers shall execute and deliver to Purchaser the Assignment and Assumption Agreement with respect to the Assumed Liabilities;

(h)    Sellers shall execute and deliver to Purchaser a trademark assignment for each registered Trademark of Sellers, in a form to be mutually agreed upon by the parties on or before August 20, 2018; and

(i)    Sellers and Purchaser shall enter into and execute a transition services agreement, in a form to be mutually agreed upon by the parties on or before August 20, 2018.

4.3    Additional Deliveries.    After the Closing Date, Sellers shall deliver to Purchaser such other instruments and documents, and shall take such other actions, as shall be reasonably

**EXHIBIT 1 - PAGE 15 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

requested by Purchaser to vest in Purchaser all of Sellers' right, title and interest in and to the Acquired Assets and otherwise to effectuate the transactions described herein.

4.4     Transaction Expenses.  Except as expressly provided herein in respect of the Expense Reimbursement (to the extent due and owing), each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement.

4.5     Prorations.  To the extent there are obligations in respect of the Acquired Assets that arose during or relate to the period up to and including the Closing Date ("Pre-Closing Obligations") and obligations that arose during or relate to the period following the Closing Date, including any and all real or personal property tax obligations ("Post-Closing Obligations"), Purchaser and Sellers shall allocate such obligations between themselves on a ratable basis that fairly reflects the portions (up to 100%) of such obligations that are Pre-Closing Obligations and that shall be paid by Sellers, and the portions (up to 100%) of such obligations that are Post-Closing Obligations and that shall be paid by Purchaser.  To the extent that any net amount is owing to Purchaser or Sellers, as the case may be under this Section 4.5 as of the Closing, the Purchase Price shall be decreased or increased, as the case may be, to the extent such prorations are identified as of the Closing, and to the extent such prorations cannot or are not identified until after the Closing, then any net amount owing to Sellers or Purchaser shall be paid by the party owing such amount.  Any net amount owing to Purchaser under this Section 4.5, shall be an administrative expense of Sellers' bankruptcy estate under section 503(b) and section 507(a)(2) of the Bankruptcy Code.

4.6     Termination of Agreement.  This Agreement may be terminated at any time prior to the Closing as follows:

(a)     by the mutual written consent of Sellers and Purchaser;

(b)     by Sellers, upon or immediately prior to the consummation of an Alternative Transaction as a result of any auction conducted in accordance with the Bidding Procedures, but only if Sellers perform their obligations under Section 4.8 and Section 7.2;

(c)     by either Purchaser or Sellers, if the Closing shall not have been consummated prior to September 28, 2018 (the "Outside Date"); provided, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Sellers, then Purchaser (if Purchaser is in breach) or Sellers (if Sellers are so in breach), respectively, may not terminate this Agreement pursuant to this Section 4.6(c);

(d)     by either Purchaser or Sellers, if (a) the Bidding Procedures Order has not been entered by the Bankruptcy Court, or if the Stalking Horse Provisions have not been approved by the Bankruptcy Court by the close of business on August 27, 2018 (b) the Bidding Procedures Order has been appealed, withdrawn, revoked, rescinded, or

12

EXHIBIT 1 - PAGE 16 OF 49

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

modified, or (c) the Bidding Procedures Order has not become a final, non-appealable order within fifteen (15) calendar days following the date on which it was entered;

(e)     by either Purchaser or Sellers, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any such adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(f)     by Purchaser, if the Cure Cost with respect to each of the Assumed Executory Contracts has not been determined within the earlier of two (2) Business Days prior to the Closing Date and fourteen (14) days after the entry of the Bidding Procedures Order;

(g)     by Purchaser if either or both of the Chapter 11 Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code;

(h)     by Purchaser, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on September 24, 2018 or (ii) the Sale Order has been appealed, withdrawn, revoked, rescinded, modified or amended in any material respect without the prior written consent of Purchaser and Sellers;

(i)     by Sellers, if Purchaser fails to satisfy any of their material obligations at Closing

(j)     by Purchaser, if the Cure Costs of the Assumed Executory Contracts exceed in the aggregate $1,000,000.00; or

(k)     by Purchaser, if Sellers are in breach of any of their material obligations hereunder and, to the extent such breach is reasonably capable of cure within such period, such breach has not been cured by Sellers within five (5) calendar days after written notification by Purchaser.

4.7     <u>Procedure Upon Termination</u>.  In the event of a termination of this Agreement by Purchaser or Sellers, or both, (a) written notice thereof shall be given promptly by the terminating party to the other party or parties hereto, specifying the provision hereof pursuant to which such termination is made, (b) this Agreement shall thereupon terminate and become void and of no further force and effect, and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto.  If this Agreement is terminated as provided herein, all parties shall return all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.8     <u>Effect of Termination</u>.  In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, all of the parties shall be relieved of their duties and obligations arising under this Agreement effective as of the date of such termination

13

**EXHIBIT 1 - PAGE 17 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

and such termination shall be without Liability to Purchaser or Sellers; provided, however, that Section 4.6, Section 4.7 and this Section 4.8, and Section 7.2 hereof, and any other provisions hereof necessary to implement the provisions of such sections, shall survive any such termination and shall be enforceable hereunder. In no event shall any termination of this Agreement relieve any party hereto of any Liability for any willful breach of this Agreement by such party. For avoidance of doubt, upon termination of this Agreement, (a) the Deposit shall be delivered to any applicable party as provided in Section 3.4 and (b) Purchaser shall be entitled to the Stalking Horse Provisions to the extent set forth in Section 7.2.

4.9     Access to Records; Assistance After Closing. For a period of three (3) years following the Closing, the Parties shall cooperate with each other, and afford the other Party with reasonable access to the financial and tax records related to the Acquired Assets and the Business. Such assistance shall include, but is not limited to, Sellers requesting administrative and accounting assistance from employees hired by Purchaser pursuant to this Agreement. The Party providing employee assistance may charge the Party requesting assistance for any actual out-of-pocket costs or expenses incurred by it in rendering assistance. Such charges for employee time shall be charged at the respective employees' annual compensation rates, including benefits, calculated over a 2080 working hour year.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, on a joint and several basis, make the following representations and warranties to Purchaser:

5.1     Organization and Power. Sunshine Dairy Foods Management, LLC is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Oregon and Karamanos Holdings, Inc. is a corporation duly organized, validly existing and in good standing under the Laws of the State of Oregon. Sellers have all requisite power and authority to own the Acquired Assets.

5.2     Corporate Authorization. Subject to entry of the Sale Order, Sellers have full corporate power and authority to execute and deliver any and all Transaction Documents and to perform the obligations thereunder. Subject to entry of the Sale Order, the execution, delivery and performance of Sellers of the Transaction Documents have been duly and validly authorized and no additional corporate authorization or consent is required in connection therewith.

5.3     Binding Effect. Subject to entry of the Sale Order, this Agreement has been duly executed and delivered by Sellers. This Agreement, when executed and delivered by Purchaser, and the other Transaction Documents when executed and delivered, will, upon the entry of the Sale Order, constitute the valid and legally binding obligations of Sellers, enforceable against Sellers jointly and severally in accordance with their respective terms.

5.4     Ownership of Acquired Assets. Sellers own all Acquired Assets and have the right to transfer the Acquired Assets to Purchaser, in each case, effective at Closing free and clear of any Encumbrances, except for the Permitted Encumbrances.

14

**EXHIBIT 1 - PAGE 18 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

5.5    <u>Real Property</u>.    With respect to the Acquired Property, except as otherwise disclosed in writing by the Sellers to the Purchaser, there are no violations of local zoning or other Laws, no litigation pending or threatened, no pending extraordinary assessments or impositions of levies by any Governmental Body, and no unperformed obligations that are currently required by any Governmental Body, nor any hazardous substance waste or material within or on the Acquired Property.

5.6    <u>Finders' Fees</u>.  Except for Boverman & Associates, LLC, the fees and expenses of which will be paid by Sellers, there is no investment banker, broker, finder or other intermediary who has been retained by or is authorized to act on behalf of Sellers who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

5.7    <u>No Other Representations or Warranties</u>.  Except for the representations and warranties expressly contained herein, Sellers make no other express or implied representation or warranty.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE ACQUIRED ASSETS ARE ASSIGNED, "AS IS," WITHOUT ANY WARRANTY OF ANY KIND, AND SELLERS HEREBY EXPRESSLY DISCLAIMS, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL CONDITIONS OR WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTIES OF OR RELATED TO TITLE, NON-INFRINGEMENT, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OR ENFORCEABILITY.

## ARTICLE VI.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser makes the following representation and warranties to Sellers:

6.1    <u>Organization and Power</u>.    Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

6.2    <u>Authorization</u>.    Purchaser has full power and authority to execute and deliver the Transaction Documents and to perform its obligations thereunder.  The execution, delivery and performance by Purchaser of the Transaction Documents have been duly and validly authorized and no additional authorization or consent is required in connection therewith.

6.3    <u>Binding Effect</u>.    This Agreement has been duly executed and delivered by Purchaser.  This Agreement, when executed and delivered by Sellers, and the other Transaction Documents when executed and delivered, will constitute the valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles.

6.4    <u>Funding</u>.  Purchaser has, or will have as of the Closing, without the need to obtain any Third Party debt or equity financing, sufficient and unencumbered funds to consummate the transactions contemplated by this Agreement and to pay the Purchase Price, and Purchaser

15

**EXHIBIT 1 - PAGE 19 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

otherwise has the resources and capabilities (financial and otherwise) to perform its obligations to consummate the transactions contemplated by this Agreement.

6.5 <u>Adequate Assurances Regarding Assumed Executory Contracts</u>. As of the Closing, Purchaser will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Executory Contracts.

6.6 <u>Finders' Fees</u>. There is no investment banker, broker, finder or other intermediary who has been retained by or is authorized to act on behalf of Purchaser or any Affiliate of Purchaser who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement, except for any fee or commission paid directly by Purchaser and not reducing the Purchase Price in any way.

6.7 <u>Good Faith Purchaser</u>. Purchaser (i) is a "good faith" purchaser, as such term is used in the Bankruptcy Code, and (ii) is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the transactions contemplated by this Agreement. Purchaser has negotiated and entered into this Agreement in compliance with the Bidding Procedures, in compliance with section 363(n) of the Bankruptcy Code, and in good faith and without collusion or fraud of any kind.

6.8 <u>Purchaser Experience</u>. Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement. In consultation with experienced counsel and advisors of its choice, Purchaser has conducted its own independent review and analysis of the Acquired Assets, the Assumed Liabilities and the rights and obligations it is acquiring and assuming under the Transaction Documents. Purchaser acknowledges that it and its representatives have been permitted such access to the books and records, contracts and other properties related to the Acquired Assets as it required to complete its review.

## ARTICLE VII.

## CERTAIN COVENANTS

7.1 <u>Bankruptcy Sale Process</u>.

(a) Sellers will, as soon as practicable, file with the Bankruptcy Court the Sale Motion upon the parties required to be served by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, and shall seek consideration of the Sale Motion by the Bankruptcy Court. Purchaser acknowledges that the Acquired Assets may be subject to competitive bidding and that the Bidding Procedures may be supplemented by other customary procedures consistent with the terms of this Agreement, <u>provided</u> that the Bidding Procedures may not be amended, modified, or supplemented in any respect except as provided for in the Bidding Procedures.

(b) Sellers will, as promptly as possible, but in all events in accordance with the Bidding Procedures, file and serve the Notice of Proposed Assumed Executory Contracts and the Final Sale Notice, together with the proposed Sale Order and a copy of the Transaction Documents (with any redactions Sellers and Purchaser

16

**EXHIBIT 1 - PAGE 20 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

mutually deem appropriate in accordance with Bankruptcy Rule 9018 and the Bidding Procedures Order), upon the parties required to be served in accordance with the Bidding Procedures.

(c)     Sellers will, subject to the provisions of this Agreement and the Bidding Procedures Order, in consultation with Purchaser, use its reasonable best efforts to (x) respond to and resolve all timely objections to the entry of the Sale Order and (y) obtain entry of the Sale Order on or before September 24, 2018.

(d)     Purchaser will use its reasonable best efforts to assist in obtaining entry of the Sale Order, including furnishing or filing with the Bankruptcy Court such affidavits or declarations as Sellers may request for the purpose of obtaining entry of the Sale Order.

(e)     Purchaser shall not, without prior written consent of Sellers, file, join in, or otherwise support or encourage in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder.

(f)     In the event that an appeal is taken or a stay pending appeal is requested with respect to the Sale Order, Sellers shall promptly notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related notice(s) or order(s).   Sellers and Purchaser shall use their reasonable best efforts to defend any such appeal or stay request.

7.2     Stalking Horse Provisions.

(a)     In the event Sellers receive a bid, in accordance with the Bidding Procedures, to consummate an Alternative Transaction with a third-party bidder on terms that include a cash purchase price, payable at closing, of an amount at least $250,000 greater than the sum of (x) the Cash Purchase Price *plus* (y) the Break Fee *plus* (z) the maximum amount of the Expense Reimbursement, and which terms are otherwise substantially the same as, or more favorable to Sellers than the terms set forth in this Agreement, Purchaser shall consent to the sale of the Acquired Assets to such third-party bidder.

(b)     In the event Sellers enter into an agreement to consummate or consummate an Alternative Transaction, Sellers shall pay Purchaser, in accordance with the Bidding Procedures and by wire transfer to an account designated by Purchaser on the closing date of such Alternative Transaction, (i) the Break Fee and (ii) the reimbursement of all reasonable costs and expenses of Purchaser incurred in connection with Purchaser's efforts to negotiate and consummate the transactions contemplated by this Agreement (including, without limitation, the fees and expenses of counsel), but such reimbursement shall be capped at $75,000 (the "Expense Reimbursement").

(c)     The Break Fee and Expense Reimbursement shall be paid from any proceeds of an Alternative Transaction, otherwise payable to Sellers, provided that if such amounts are not paid from such proceeds, Sellers shall remain liable for such amounts.   Sellers shall have no liability with respect to Purchaser or any other person for

17

**EXHIBIT 1 - PAGE 21 OF 49**

Case 18-31644-pcm11     Doc 377     Filed 08/10/18

an amount exceeding the aggregate of the Break Fee *plus* the Expense Reimbursement in the event that this Agreement is terminated by Sellers pursuant to Section 4.6(h).

(d)     The Break Fee and Expense Reimbursement (to the extent due and owing) shall be first-priority administrative expenses of Sellers' bankruptcy estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

(e)     The obligation of Sellers to pay, and the payment by Sellers of, the Expense Reimbursement (to the extent due and owing), shall in no way limit or otherwise affect the rights of Purchaser to a return of the Deposit, including without limitation the rights of Purchaser under Section 3.4 of this Agreement.

(f)     Sellers acknowledge and agree that Purchaser would not have entered into this Agreement but for the provisions in this Section 7.2, and that the provisions of this Section 7.2 are integral to, and shall survive any termination of, this Agreement.

7.3     Pre-Closing Operating Covenants of Sellers.

(a)     During the period from the date hereof until the earlier of Closing or the termination of this Agreement in accordance with Section 4.6, Section 4.7 and Section 4.8, except as expressly provided in this Agreement, or as required by Law, subject to the limitations of the Bankruptcy Code and the Bankruptcy Rules, without the prior written consent of Purchaser, Sellers will not:

(i)     sell or transfer or create any Encumbrance upon any of the Acquired Assets;

(ii)     fail to pay any fees or expenses by the due date therefor with respect to any of the Acquired Assets and necessary to maintain the existing status and condition of the same, absent Purchaser's written authorization after good faith consideration;

(iii)     reject, cancel, terminate, amend, modify, supplement or rescind any Assumed Executory Contract or any terms of any Assumed Executory Contract without the express written approval of Purchaser, which shall not be unreasonably withheld or delayed, except for the purpose of effecting any changes in applicable Law or implementing regulatory requirements;

(iv)     enter into any new Contract or renew any existing Contract requiring payments by Sellers;

(v)     conduct or fail to conduct any operation related to the Acquired Property outside the ordinary course of business;

(vi)     cease or limit operations at the Acquired Property;

(vii)     terminate any employees listed in Exhibit B;

18

**EXHIBIT 1 - PAGE 22 OF 49**

Case 18-31644-pcm11     Doc 377     Filed 08/10/18

(viii) incur any long-term expenditure associated with the Acquired Assets that would be an Assumed Liability;

(ix) transfer, sell, assign, abandon, permit to lapse or grant any rights or modify any existing rights to the Acquired Assets, or enter into any settlement regarding the breach or infringement, misappropriation, dilution or other violation of, or challenge the title to, any such Acquired Assets; or

(x) institute, settle or agree to settle or modify in any manner that is adverse to the Acquired Assets, any litigation, action or other Legal Proceeding before any court or Governmental Body relating to the Acquired Assets and that is or will be an Assumed Liability.

(b) Concurrent with Closing, Sellers will prepare and file with the appropriate Governmental Body appropriate documents, including, but not limited to, articles of amendment or changing Sellers' names so as to effectuate the transfer of the Acquired Assets.

7.4     Access to Information.

(a) Sellers agree that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 4.6, Purchaser shall be entitled, through its officers, employees, counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, Documents, properties, businesses, assets, accountants, auditors, counsel and operations of Sellers as Purchaser's Representatives may reasonably request, provided, however, that Sellers shall not be obligated to provide information that they are not permitted to provide under applicable Law. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including Sellers' right to have their Representatives accompany Purchaser and its Representatives at the time of any on-site inspection or examination and shall be subject to restrictions under applicable Law. Pursuant to this Section 7.4, Sellers shall furnish to Purchaser and its Representatives such financial, operating and property related data and other information as such Persons reasonably request. Sellers shall use commercially reasonable efforts to cause their Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with Sellers and their Representatives and shall use their reasonable efforts to minimize any disruption to the Business. Purchaser and its Representatives shall be permitted to contact, or engage in discussions or otherwise communicate with Sellers' landlords, clients, suppliers and other Persons with which Sellers have material commercial dealings, provided, that Purchaser must obtain the prior consent of Sellers, which consent shall not be unreasonably withheld or delayed, to initiate such communications and give Sellers the opportunity to be present therefor.

19

**EXHIBIT 1 - PAGE 23 OF 49**

Case 18-31644-pcm11     Doc 377     Filed 08/10/18

(b)     No information received pursuant to an investigation made under this Section 7.4 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of Sellers set forth in this Agreement or any certificate or other instrument delivered to Purchaser in connection with the transactions contemplated hereby, (ii) limit or restrict the remedies available to the parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity, or (iii) limit or restrict the ability of either party to invoke or rely on the conditions to the obligations of the parties to consummate the transactions contemplated by this Agreement set forth in Article VIII.

7.5     Reasonable Efforts; Further Assurances of Each Party.  During the period from the date hereof until the earlier of Closing or the termination of the Agreement in accordance with Section 4.6, Section 4.7 and this Section 4.8, in each case, subject to the limitations of the Bankruptcy Code and Bankruptcy Rules:

(a)     each party will use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article VIII; and

(b)     the parties will execute and deliver any documents, instruments or conveyances of any kind and take all other actions which may be reasonably necessary or advisable to carry out the intent of this Agreement and the transactions contemplated herein.

7.6     Regulatory Affairs.    Sellers shall, to the fullest extent permitted by applicable Law, (i) promptly advise Purchaser of the receipt of any communication from any state or foreign Governmental Body or other U.S. Governmental Body whether oral, written, electronic or otherwise, (ii) provide Purchaser with a reasonable opportunity to participate in the preparation of any response thereto and the preparation of any other substantive submission or communication to any such Governmental Body and to review any such response, submission or communication prior to the filing or delivery thereof, and (iii) provide Purchaser with the opportunity to participate in any meetings or substantive telephone conversations that Sellers or their Representatives may have from time to time with any such Governmental Body.     At Purchaser's request, Sellers shall assist Purchaser in obtaining any meetings with, or facilitating communications between, Purchaser and any state or foreign Governmental Body or other U.S. Governmental Body.

## ARTICLE VIII.

## CONDITIONS TO CLOSING

8.1     Conditions Precedent to the Obligations of Sellers and Purchaser.  The respective obligations of each party to this Agreement to consummate the transactions contemplated herein are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Sellers and Purchaser in whole or in part to the extent permitted by applicable Law):

20

**EXHIBIT 1 - PAGE 24 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

(a)     there shall not be in effect any statute, rule, regulation, Law or Order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the Bankruptcy Court shall have entered the Bidding Procedures Order and such order shall be a Final Order and in form and substance reasonably satisfactory to Purchaser and shall be final and non-appealable, and shall not have been stayed, appealed, withdrawn or vacated;

(c)     the Bankruptcy Court shall have entered the Sale Order and such order shall be a Final Order and in form and substance reasonably satisfactory to Purchaser and shall be final and non-appealable, and shall not have been stayed, appealed, withdrawn or vacated; and

(d)     there shall not be any judgment, decree, injunction, order or ruling in effect preventing the consummation of the transactions contemplated by this Agreement.

8.2     Conditions Precedent to the Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     Covenants and Representations.  Purchaser shall have performed in all material respects all agreements and covenants required hereby to be performed by Purchaser prior to or at the Closing Date, and the representations and warranties of Purchaser made in Article VI shall be correct and complete in all material respects as of the Closing Date as if made on such date;

(b)     Purchase Price.  On or prior to the Closing Date, Purchaser shall have paid the Purchase Price; and

(c)     Deliveries.  On or prior to the Closing Date, Purchaser shall have delivered to Sellers each of the items set forth in Section 4.2 of this Agreement.

8.3     Conditions Precedent to the Obligations of Purchaser.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     Covenants and Representations.  Sellers shall have performed in all material respects all agreements and covenants required hereby to be performed by Sellers prior to or at the Closing Date, and the representations and warranties of Sellers in Article V shall be correct and complete in all material respects as of the Closing Date as if made on such date;

**EXHIBIT 1 - PAGE 25 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

(b)     <u>Deliveries</u>.  On or prior to the Closing Date, Sellers shall have delivered to Purchaser each of the items set forth in <u>Section 4.2</u> of this Agreement;

(c)     <u>Taxes</u>. On or prior to the Closing Date, Sellers shall have paid, or made arrangements to pay, all property Taxes on the Acquired Property due or assessed prior to the Closing Date, excluding any Transfer Taxes;

(d)     <u>Consents</u>. On or prior to the Closing Date, Sellers shall have received, in a form reasonably acceptable to Purchaser, all consents necessary to assign the Assumed Executory Contracts;

(e)     <u>Employees</u>. On or prior to the Closing Date, no fewer than (i) five (5) of the Key Employees and (ii) a majority of the Other Employees shall have accepted employment with Purchaser on terms and conditions satisfactory to Purchaser; and

(f)     <u>Permits and Licenses</u>.  All of the Permits and licenses necessary for Purchaser to acquire the Acquired Assets, and assume the Assumed Liabilities, shall have been obtained, and all such consents, Permits and licenses shall be in full force and effect.

## ARTICLE IX.

## MISCELLANEOUS

9.1     <u>Transfer Taxes</u>.  Any sales, use, transfer, deed, fixed asset, stamp, documentary stamp or other similar type Taxes and recording charges (each, a "<u>Transfer Tax</u>") which may be payable by reason of the acquisition of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein shall be timely paid by Purchaser.  Purchaser and Sellers shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

9.2     <u>Releases</u>.  Effective as of and conditioned upon the occurrence of Closing, Purchaser hereby releases and forever discharges Sellers and Sellers' directors, officers, employees, agents, representatives, successors, assigns, and holders of Claims or interests in Sellers' chapter 11 bankruptcy estate, from any and all actions, suits, debts, liens, sums of money, accounts, judgments, claims and demands whatsoever, at law or in equity, either in contract or in tort, whether known or unknown, on account of, arising out of or relating to any act or omission of any kind or character whatsoever that relates to Sellers or this Agreement and the proposed transactions contemplated herein occurring at or prior to the Closing; <u>provided</u> that nothing in this <u>Section 9.2</u> shall release or discharge any Claim of Purchaser under this Agreement.

9.3     <u>Survival</u>.  Except as expressly provided for herein, none of the (a) covenants or agreements to be performed by either Sellers or Purchaser prior to the Closing pursuant to this Agreement and (b) representations and warranties by Sellers or Purchaser contained in this Agreement shall survive Closing, and neither Sellers nor Purchaser shall have liability to the other party after Closing for any breach of any such covenant, agreement, representation or

22

warranty. Except as set forth in the immediately preceding sentence, the covenants and agreements of the parties set forth in this Agreement will survive until fully performed or until such performance is expressly waived in writing by Purchaser (in the case of covenants and agreements of Sellers) or Sellers ((in the case of covenants and agreements of Purchaser).

9.4 <u>Injunctive Relief</u>. Damages at Law may be an inadequate remedy for the breach by Purchaser or Sellers of any of their covenants, promises and agreements contained in this Agreement and, accordingly, each of Purchaser and Sellers shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights of Purchaser and Sellers set forth in this <u>Section 9.4</u> shall be in addition to any other rights which a party may have at Law or in equity pursuant to this Agreement.

9.5 <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the Exhibits hereto and other documents specifically referred to herein) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. Any provision of this Agreement may be amended or waived if such amendment or waiver is in writing and signed, in the case of an amendment, by Purchaser and Sellers, or in the case of a waiver, by the party against whom the waiver is effective. No failure or delay by a party in exercising any right, power or privilege hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein will be cumulative and, except as otherwise expressly provided herein, are not exclusive of any rights or remedies provided by applicable Law.

9.6 <u>Counterparts; Electronic Signatures</u>. For the convenience of the parties hereto, this Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement. Facsimile signatures or signatures delivered by email in PDF or similar format will be deemed original signatures for purposes of this Agreement.

9.7 <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the Laws of the State of Oregon without regard to principles of conflicts of Law. The parties hereby submit to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Oregon (the "<u>Bankruptcy Court</u>") and any U.S. federal appellate court therefrom (or, if the United States Bankruptcy Court for the District of Oregon declines to or may not accept authority or jurisdiction over a particular matter, the United States District Court for the District of Oregon; or if the United States District Court for the District of Oregon declines to or may not accept jurisdiction over a particular matter, any state court within Multnomah County of the State of Oregon) for any actions, suits or proceedings arising out of or relating to this Agreement or the transactions contemplated herein (and each party agrees not to commence any action, suit or proceeding relating thereto except in such courts), and each party further agrees that service of any process, summons, notice or document by U.S. registered mail to its respective address set forth in <u>Section 9.9</u> shall be effective service of process for any action, suit or proceeding brought against it in any such court.

23

**EXHIBIT 1 - PAGE 27 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

9.8     Waiver of Jury Trial.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.9     Notices.   Unless otherwise set forth herein, any notice, request, instruction or other document to be given hereunder by any party to the other parties shall be in writing and shall be deemed duly given (i) upon delivery, when delivered personally, (ii) one (1) day after being sent by overnight courier or when sent by facsimile transmission or email PDF format (with a confirming copy sent by overnight courier), and (iii) three (3) calendar days after being sent by registered or certified mail, postage prepaid, as follows:

If to Sellers, to:

> Sunshine Dairy Foods Management, LLC
> c/o Boverman and Associates, LLC
> 11285 SW Walker Rd.
> Portland, OR 97225
> Attention:  Dan Boverman
> Email:     danboverman@boverman.biz

> And

> Karamanos Holdings, Inc
> c/o Boverman and Associates, LLC
> 11285 SW Walker Rd.
> Portland, OR 97225
> Attention:  Dan Boverman
> Email:     danboverman@boverman.biz

With copies to:

> Motschenbacher & Blattner LLP
> 117 SW Taylor Street, Suite 300
> Portland, OR 97204
> Attention:  Nicholas J. Henderson
> Email:     nhnderson@portlaw.com

> Vanden Bos & Chapman, LLP
> 319 SW Washington, Suite 520
> Portland, OR 97204
> Attention:  Douglas R. Ricks
> Email:     doug@vbcattorneys.com

> Norman Davidson, III
> Attorney at Law

24

**EXHIBIT 1 - PAGE 28 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

630 West Duarte Road, #208
Arcadia, California 91007
Attention: Norman Davidson III
Email: nick@normandavidsonlaw.com


If to Purchaser, to:

Lyrical Foods, Inc.
3180 Corporate Place
Hayward, CA 94545
Attn: Chief Executive Office
Email: rob@kite-hill.com


With copies to:

Wilmer Cutler Pickering Hale and Dorr LLP
950 Page Mill Road
Palo Alto, CA 94304
Attention: Eric Hanson
Email: eric.hanson@wilmerhale.com

and
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
New York, New York 10007
Attention: George Shuster and Benjamin Loveland
Email: george.shuster@wilmerhale.com

or to such other Persons or addresses as may be designated in writing by the party to receive such notice.

9.10    Binding Effect; Assignment.    This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.    Nothing in this Agreement will create or be deemed to create any Third Party beneficiary rights in any Person or entity not a party to this Agreement.    None of the parties may assign or delegate its rights or obligations under this Agreement (whether by operation of Law, change of control, or otherwise), either in whole or in part, without the prior written consent of the other party, provided, however, that Purchaser may assign, delegate or transfer any of its rights or obligations under this Agreement to any wholly-owned direct or indirect Subsidiary of Purchaser by sending written notice to, but without the consent of, Sellers; provided, further, that such assignment, delegation or transfer shall not relieve Purchaser of any liability or obligation under this

25

**EXHIBIT 1 - PAGE 29 OF 49**
Case 18-31644-pcm11    Doc 377    Filed 08/10/18

Agreement. Any attempted assignment, delegation or transfer in violation of this Section 9.10 shall be void and without effect.

9.11    Third Party Beneficiaries.    No Person other than the parties hereto (and any permitted assignee under Section 9.10) shall have any rights or claims under this Agreement.

9.12    Publicity.    Except as required by law or the Bankruptcy Court, neither Sellers nor Purchaser will issue any press release or make any public statement regarding the transactions contemplated hereby, without the prior written consent of the other party.

9.13    Severability.    If any provision of this Agreement is determined to be invalid or unenforceable, the validity or enforceability of the other provisions of this Agreement as a whole will not be affected; and, in such event, Sellers and Purchaser shall negotiate in good faith to change and interpret such provision so as to best accomplish the objectives of such provision within the limits of applicable Law or applicable court decision.

9.14    Time of the Essence.    Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

9.15    Obligations of Parties. If more than one person or entity is named as a Seller, the term "Sellers" shall refer to each person or entity so named and any one or more of them in any combination, and the representations, warranties, covenants, obligations and liabilities of Sellers herein shall constitute their joint and several representations, warranties, covenants, obligations and liabilities, except as otherwise specifically provided herein.

9.16    Miscellaneous.

(a)    Certain Interpretations.    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Schedules and Exhibits to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," "includes" and "including," when used herein, shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

26

**EXHIBIT 1 - PAGE 30 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

(v)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.

(vi)     Any reference in this Agreement to $ shall mean United States Dollars.

(vii)     Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)     The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)     The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(c)     This Agreement is the result of the joint efforts of the parties hereto, and each provision hereof has been subject to the mutual consultation, negotiation, and agreement of the parties and there is to be no construction against any party based on any presumption of that party's involvement in the drafting thereof.

(d)     Purchaser acknowledges hereby that Sellers may not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

*[Signature Pages Follow]*

27

**EXHIBIT 1 - PAGE 31 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

SELLERS:

SUNSHINE DAIRY FOODS MANAGEMENT, LLC

By:

Name: Daniel J. Boverman
Title: Chief Restructuring Officer

KARAMANOS HOLDINGS, INC.

By:

Name: Daniel J. Boverman
Title: Chief Restructuring Officer

**EXHIBIT 1 - PAGE 32 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

DocuSign Envelope ID: 98BD549C-CDAC-4ADF-89E0-874A7C25E0BD

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

**LYRICAL FOODS, INC.**

By: _Rob Leibowitz_____
     Name:  Rob Leibowitz
     Title:   CEO

## EXHIBIT A

### Acquired Assets

All assets at or relating to the operation of the Business, including, but not limited to:

| Item # | Description | Location |
|--------|-------------|----------|
| 1 | Acquired Property (fee simple real property interest) | 8440 NE Halsey Street, Portland, OR 97220 |
| 2 | Active Inventories (Not excess or obsolete) | Acquired Property |
| 3 | Office Supplies | Acquired Property |
| 4 | Equipment (as listed below) | Acquired Property |
| 5 | Furniture and Fixtures | Acquired Property |
| 6 | Documents and Data | Acquired Property |
| 7 | Cabinetry | Acquired Property |
| 8 | Chemicals and Production Supplies | Acquired Property |
| 9 | Signage | Acquired Property |
| 10 | All Intellectual Property of the Sellers | N/A |

| Equipment | | |
|--------|-------------|----------|
| Item # | Description | Location |
| 1 | Boiler | Acquired Property |
| 2 | Air Compressor | Acquired Property |
| 3 | Air Compressor | Acquired Property |
| 4 | Ammonia Room Equipment | Acquired Property |
| 5 | (4) Tank Mix System | Acquired Property |
| 6 | (3) Tank Mix System | Acquired Property |
| 7 | Osgood Filler (Some Repair Needed) | Acquired Property |

**EXHIBIT 1 - PAGE 34 OF 49**

Case 18-31644-pcm11   Doc 377   Filed 08/10/18

| 8 | Osgood Filler (Some Repair Needed) | Acquired Property |
|---|---|---|
| 9 | Metal Detector | Acquired Property |
| 10 | Domino Coder | Acquired Property |
| 11 | Domino Coder | Acquired Property |
| 12 | Cup Conveyor | Acquired Property |
| 13 | A&F Case Packer | Acquired Property |
| 14 | A&F Case Packer | Acquired Property |
| 15 | Pallet Jack | Acquired Property |
| 16 | Pallet Jack | Acquired Property |
| 17 | Combi | Acquired Property |
| 18 | Case Erector | Acquired Property |
| 19 | Platform Scale | Acquired Property |
| 20 | CIP System | Acquired Property |
| 21 | Metal Detector, Domino Coders, Conveyor On line 1 | Acquired Property |
| 22 | Liquifier | Acquired Property |
| 23 | 5000 Gallon Tank | Acquired Property |
| 24 | 5000 Gallon Tank | Acquired Property |
| 25 | CIP Rinse Tank | Acquired Property |
| 26 | APV Heat Exchanger | Acquired Property |
| 27 | COP Tank | Acquired Property |
| 28 | 1500 Gallon Tank | Acquired Property |
| 29 | 1500 Gallon Tank | Acquired Property |
| 30 | 2000 Gallon Tank | Acquired Property |

**EXHIBIT 1 - PAGE 35 OF 49**

Case 18-31644-pcm11   Doc 377   Filed 08/10/18

| 31 | 2000 Gallon Tank | Acquired Property |
|----|------------------|-------------------|
| 32 | 2000 Gallon Tank | Acquired Property |
| 33 | Pallet Jack | Acquired Property |
| 34 | Lift Truck | Acquired Property |
| 35 | 3000 Gallon Tank | Acquired Property |
| 36 | Homogenizer | Acquired Property |
| 37 | HTST | Acquired Property |
| 38 | Pumps and. Valves for Tanks | Acquired Property |
| 39 | Chiller | Acquired Property |
| 40 | Glycol System | Acquired Property |
| 41 | Scissors Lift | Acquired Property |
| 42 | Lift Truck | Acquired Property |
| 43 | 20000 Silo | Acquired Property |
| 44 | 20000 Silo | Acquired Property |
| 45 | 10000 Gallon Tank | Acquired Property |
| 46 | Piping, Hose, Magnet, Heat Exchanger | Acquired Property |
| 47 | Machine Shop | Acquired Property |
| 48 | Murzan Pump | Acquired Property |
| 49 | Murzan Pump | Acquired Property |
| 50 | Domino Coder | Acquired Property |
| 51 | Domino Coder | Acquired Property |
| 52 | Pick up items | Acquired Property |
| 53 | Lift Truck | Acquired Property |
| 54 | 2100 Gallon Tank: | Acquired Property |

**EXHIBIT 1 - PAGE 36 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

| 55 | 2100 Gallon Tank | Acquired Property |
|----|------------------|-------------------|
| 56 | Square Storage Tank | Acquired Property |
| 57 | 1500 Gallon Tank | Acquired Property |
| 58 | Separator | Acquired Property |
| 59 | Murzan Pump | Acquired Property |
| 60 | Murzan Pump | Acquired Property |
| 61 | DAF | Acquired Property |

**EXHIBIT 1 - PAGE 37 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

**EXHIBIT B**

**Assumed Executory Contracts**

| Name of Contracting Party | Title | Date Entered Into |
|---|---|---|
| Gerber Products Company | Supply Agreement | December 1, 2009 |
| Ripple Foods, Inc. | Co-Packing Agreement | September 15, 2017, as amended |
| Local No. 305 (Teamsters, Dairy, Bakery & Food Processors, Industrial, Technical & Automotive) | Plant and Drive Agreement | March 1, 2014 |
| Local No. 305 (Teamsters, Dairy, Bakery & Food Processors, Industrial, Technical & Automotive) | Labor Agreement | September 1, 2016 |

**EXHIBIT 1 - PAGE 38 OF 49**

Case 18-31644-pcm11   Doc 377   Filed 08/10/18

**EXHIBIT C**

**Assumed Liabilities**

The term "Assumed Liabilities" means, collectively, all of the following:

1.  The obligations of Sellers arising after the Closing Date under any Assumed Executory Contract (listed on Exhibit B to this Agreement).

2.  Obligations with respect to the Acquired Assets to the extent that such obligations accrue and are required to be performed from and after the Closing Date.

3.  The Permitted Encumbrances.

**EXHIBIT 1 - PAGE 39 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

# EXHIBIT D

## Employees

Schedule 1 – Key Employees

| Name | Title | Department |
|------|-------|------------|
| R█ W█ | General Manager | Management |
| J█ P█ | Plant Manager | Management |
| K█ P█ | Plant Manager | Management |
| K█ R█ | QA Manager | Management |
| A█ S█ | Supervisor | Management |
| T█ M█ | Controller | Management |
| A█ S█ | Admin | Management |

Schedule 2 – Other Employees

| Name | Title | Department |
|------|-------|------------|
| C█ J█ | Caser Operator (Yogurt EP Prod) | Production |
| D█ C█ | Mix Operator (Yogurt EP Prod) | Production |
| E█ R█ | Mix Operator (Yogurt EP Prod) | Production |
| G█ H█ | Filler Operator (Yogurt EP Prod) | Production |
| J█ C█ | Production Lead | Production |
| M█ W█ | Pasteurizer (Yogurt EP Prod) | Production |
| R█ R█ | Caser Operator (Yogurt EP Prod) | Production |
| R█ S█ | Warehouse (Yogurt EP Prod) | Production |
| S█ C█ | Caser Operator (Yogurt EP Prod) | Production |
| S█ P█ | Pasteurizer (Yogurt EP Prod) | Production |

**EXHIBIT 1 - PAGE 40 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

| T███ J███ | Sanitation Technician | Production |
|---|---|---|
| C███ B███ H███ | Utility Worker (Milk WP Prod) | Production |
| E███ C███ | Dispenser Filler Operator (Milk WP Prod) | Production |
| J███ S███ | Filler Operator (Milk WP Prod) | Production |
| K███ K███ | Pasteurizer (Milk WP Prod) | Production |
| L███ L███ | Filler Operator (Milk WP Prod) | Production |
| M███ V███ | Filler Operator (Milk WP Prod) | Production |
| W███ P███ | Filler Operator (Ice Cream) | Production |
| C███ D███ | Day Shift Cooler (Milk Storage) | Production |
| D███ P███ | Day Whse Supervisor (Milk Storage) | Production |
| E███ J███ | Day Shift Cooler (Milk Storage) | Production |
| F███ W███ | Day Shift Cooler (Milk Storage) | Production |
| J███ P███ | Night Shift Cooler (Milk Storage) | Production |
| T███ C███ | Production Supervisor (Yogurt EP Prod) | Production |
| D███ P███ | Maintenance Mechanic Forman (Maintenance WP | Maintenance |
| M███ P███ | Maintenance Mechanic Forman (Maintenance WP | Maintenance |
| T███ Y███ | Maintenance Mechanic Forman (Maintenance WP | Maintenance |
| C██ B██ | Driver (DC) | Transportation |
| C███ C███ | Driver (DC) | Transportation |
| T███ B███ | Driver (DC) | Transportation |
| J███ W███ | DC Supervisor (DC) | Transportation |

**EXHIBIT 1 - PAGE 41 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

| K█████ S████████ | Technician (East QA) | Quality Assurance |
|---|---|---|
| B████ P████████ | Technician (West QA) | Quality Assurance |
| D████ A██████ | Technician (West QA) | Quality Assurance |
| J██ B████████ | QA Compliance Officer (West QA) | Quality Assurance |
| D████ C██████ | Sanitation Manager | Sanitation |
| M████ B████ | Forklift Operator (Warehouse) | Warehouse |

**EXHIBIT 1 - PAGE 42 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

# EXHIBIT E

## Form of Bill of Sale

**THIS BILL OF SALE** dated as of _____, by and among LYRICAL FOODS, INC., a Delaware corporation ("Purchaser"), SUNSHINE DAIRY FOODS MANAGEMENT, LLC, an Oregon limited liability company, and KARAMANOS HOLDINGS, INC., an Oregon corporation (each a "Seller", collectively the "Sellers").

**WHEREAS,** the parties hereto have entered into an Asset Purchase Agreement dated as of [_____], 2018 (the "Purchase Agreement") providing for the acquisition by Purchaser of certain assets of Sellers, and the parties now desire to carry out such transaction by Sellers' execution and delivery to Purchaser of this instrument evidencing the vesting in Purchaser of all of the assets and rights of Sellers hereinafter described. Capitalized terms used but not defined herein have the meanings given them in the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the premises and of other valuable consideration to Sellers in hand paid pursuant to the Purchase Agreement, at or before the execution and delivery hereof, the receipt and sufficiency of which by Sellers are hereby acknowledged, Sellers hereby convey, grant, sell, transfer, set over, assign, remise, release and deliver unto Purchaser, its successors and assigns forever, effective as of 12:01 a.m. Pacific Time on the date hereof (the "Effective Time"), all of Sellers right, title and interest in and to the Acquired Assets, free and clear of any Encumbrances, without representation or warranty, express or implied.

PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS OTHER THAN AS SET FORTH IN THE PURCHASE AGREEMENT. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT, IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

Sellers hereby covenant that, from time to time after the delivery of this instrument, at Purchaser's request and without further consideration, Sellers will do, execute, acknowledge, and deliver, or will cause to be done, executed, acknowledged and delivered, all and every such

**EXHIBIT 1 - PAGE 43 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

further acts, deeds, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required, and in form and substance reasonably acceptable to Purchaser, to effectively convey, transfer to and vest in Purchaser, and to put Purchaser in possession of, any of the Acquired Assets.

Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any person, firm or corporation other than Purchaser and its successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or condition hereof, and all of the terms, covenants and conditions, promises and agreements in this instrument contained shall be for the sole and exclusive benefit of Purchaser and its successors and assigns.

This instrument is executed by, and shall be binding upon, Sellers and their successors and assigns for the uses and purposes above set forth and referred to, effective as of the Effective Time.

This instrument shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of Oregon, without regard to its conflict of law principle provisions.

To the extent this Bill of Sale is inconsistent with any terms or conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

This instrument may be executed in counterpart signature pages, all of which when so executed and attached hereto shall constitute one and the same original.

*[Signature pages follow.]*

**EXHIBIT 1 - PAGE 44 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

**IN WITNESS WHEREOF**, the parties hereto have executed this Bill of Sale or caused this Bill of Sale to be executed on their behalf by a duly authorized officer as of the date first set forth above.

**SELLERS:**

**SUNSHINE DAIRY FOODS MANAGEMENT, LLC.**

By:_____
      Name:    Daniel J. Boverman
      Title:     Chief Restructuring Officer

**KARAMANOS HOLDINGS, INC.**

By:_____
      Name:    Daniel J. Boverman
      Title:     Chief Restructuring Officer

**IN WITNESS WHEREOF**, the parties hereto have executed this Bill of Sale or caused this Bill of Sale to be executed on their behalf by a duly authorized officer as of the date first set forth above.

**PURCHASER:**

**LYRICAL FOODS, INC.**

By:_____
     Name:  Rob Leibowitz
     Title:   CEO

**EXHIBIT 1 - PAGE 46 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

# EXHIBIT F

## Form of Assignment and Assumption Agreement

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is entered into as of _____, by and among SUNSHINE DAIRY FOODS MANAGEMENT, LLC, an Oregon limited liability company, KARAMANOS HOLDINGS, INC., an Oregon corporation (each an "Assignor", and collectively "Assignors"), and LYRICAL FOODS, INC., a Delaware corporation ("Assignee").

## W I T N E S E T H:

WHEREAS, Assignors and Assignee entered into that certain Asset Purchase Agreement dated as of [_____], 2018 (the "Purchase Agreement"; capitalized terms used but not otherwise defined herein have the meanings given them in the Purchase Agreement); and

WHEREAS, pursuant to the Purchase Agreement, Assignors have agreed to assign certain rights and agreements to Assignee, and Assignee has agreed to assume certain obligations of Assignors, as set forth therein and herein.

NOW, THEREFORE, in consideration of the premises, the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto mutually covenant and agree as follows:

1.      Effective as of 12:01 a.m. Pacific Time on the date hereof, Assignors hereby sell, transfer and assign (collectively the "Assignment") to the Assignee, and Assignee hereby assumes and agrees to pay, perform and discharge, each and all of the Assumed Liabilities, as that term is defined in the Purchase Agreement.

2.      This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

3.      This Agreement shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of Oregon, without regard to its conflict of law principle provisions and rules.

4.      To the extent this Agreement is inconsistent with any terms or conditions in the Purchase Agreement, the Purchase Agreement shall control.

5.      This Agreement may be executed in counterpart signature pages, all of which when so executed and attached hereto shall constitute one and the same original.

*[Signature pages follow.]*

**EXHIBIT 1 - PAGE 47 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption Agreement as of the date first set forth above.

**ASSIGNORS:**

**SUNSHINE DAIRY FOOD MANAGEMENT, LLC**

By:_____
    Name:    Daniel J. Boverman
    Title:     Chief Restructuring Officer

**KARAMANOS HOLDINGS, INC.**

By:_____
    Name:    Daniel J. Boverman
    Title:     Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption Agreement as of the date first set forth above.

ASSIGNEE:

**LYRICAL FOODS, INC.**

By:_____
     Name:  Rob Leibowitz
     Title:    CEO

**EXHIBIT 1 - PAGE 49 OF 49**

Case 18-31644-pcm11    Doc 377    Filed 08/10/18