Nicholas J. Henderson, OSB #074027
nhenderson@portlaw.com
MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor St., Suite 300
Portland, OR 97204
Telephone: (503) 417-0508
Facsimile: (503) 417-0528

Of Attorneys for Karamanos Holdings, Inc.,
Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Bankruptcy Case Nos. |
| SUNSHINE DAIRY FOODS MANAGEMENT, LLC, and | 18-31644-pcm11 (Lead Case) |
| | 18-31646-pcm11 |
| KARAMANOS HOLDINGS, INC., | KARAMANOS HOLDINGS, INC.'S MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTIONS AND EXPENSE REIMBURSEMENTS, AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES |
| Debtors-in-Possession. | |

Debtor-in-Possession, Karamanos Holdings, Inc. ("Karamanos") moves this Court for

entry of an order pursuant to 11 USC §§ 105(a) and 363 approving bidding procedures related to

a proposed sale of Debtors' West Plant assets, approving overbid protection, approving expense

reimbursement for the initial bidder and approving the form and manner of notice of bidding

procedures.  In support of this motion, Karamanos represents as follows:

1.      Karamanos and Sunshine Dairy Foods Management, LLC ("Sunshine") (together,

the "Debtors") filed their voluntary Petitions under Chapter 11 of Title 11 of the United States

Code (the "Bankruptcy Code") on May 9, 2018 in the United States Bankruptcy Court for the

Page 1 of 7

{00225814:4}

MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Case 18-31644-pcm11    Doc 572    Filed 11/30/18

District of Oregon (the "Bankruptcy Court"). The Debtors cases are jointly administered under case number 18-31644-pcm11.

2.    Debtors remain in possession of their respective assets and continue to manage their affairs as debtor-in-possession pursuant to § § 1107(a) and 1108 of the Bankruptcy Code.

3.    The relief requested herein by Karamanos is based on the Court's authority pursuant to 11 USC § 105(a) and 11 USC § 363.

4.    Sunshine is a limited liability company headquartered in Portland, Multnomah County, Oregon. Karamanos is an Oregon corporation headquartered in Portland, Multnomah County, Oregon. At the commencement of the bankruptcy cases, Sunshine was in the business of manufacturing, packaging, and distributing dairy, non-dairy, and other related food products throughout the United States of America. The Debtors are the successor entities to the dairy delivery business founded in 1935 by John Karamanos.

5.    On May 8, 2018, Debtors employed Daniel J. Boverman as CRO to render turnaround management services in connection with the possible investment, sale, merger, consolidation, reorganization or other business combination, or similar transactions involving all or a substantial portion of the business or assets of the company, whether effected in one transaction or a series of transactions.

6.    On June 20, 2018, Karamanos hired CBRE Group, Inc. ("CBRE") as its real estate broker to market and sell Karamanos' real property and improvements at the so-called "West Plant" previously operated by Sunshine.

7.    CBRE, its representatives and professionals marketed the property, and contacted multiple potential investors and asset acquirers. Karamanos entered into confidentiality agreements and provided due diligence access with respect to those parties interested in pursuing

MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

the matter.  Karamanos and CBRE have reviewed, considered and responded to various proposals and inquiries related to the potential purchase of Karamanos' West Plant assets. CBRE and Karamanos solicited multiple rounds of bids from interested parties.

8.	After review of the numerous bids, and after receiving enhanced bids from several bidders selected to participate in additional rounds of bidding, Karamanos has determined, in the exercise of its business judgment, that the offer from NBP Capital, LLC ("NBP Capital") is the best offer received at this time with a likelihood of the transaction being successfully completed.

9.	On November 27, 2018, Debtors entered into the Real Estate Purchase and Sale Agreement with NBP Capital (the "PSA").  A copy of the PSA is attached hereto as **Exhibit 1** and incorporated herein by this reference.

10.	Karamanos intends to sell the assets described in the PSA (the "Acquired Assets") pursuant to a sale free and clear of all free and clear of all liens, claims, rights, interests debts, liabilities and encumbrances, other than the Lease (defined in the PSA), in accordance with § 363 of the Bankruptcy Code, with the opportunity for additional qualified parties to bid on the Acquired Assets at a time and place prior to the hearing on the sale.  The bidding procedures set forth below are designed to comply with the PSA and allow other interested parties an opportunity to bid.

11.	In order to induce NBP Capital to enter into the PSA, and in recognition of the costs incurred and to be incurred and efforts undertaken and to be undertaken in connection with the contemplated transactions, including due diligence investigation and legal and professional expenses incurred in negotiating and documenting the transaction, Karamanos agreed to seek court approval of certain bidding procedures, overbid protections, and expense reimbursement obligations as set forth in the PSA.

MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

12.     Debtors request approval of certain protections to NBP Capital as an inducement for being the Initial Bidder.  Specifically, Debtor seeks authority to pay NBP Capital expense reimbursements in an amount of up to $225,000 (as defined in the PSA, the "Expense Reimbursement") if NBP Capital is not approved by the Bankruptcy Court as the purchaser of the Acquired Assets by reason of Karamanos entering into an agreement to consummate, or consummating, an Alternative Transaction (as defined in the PSA) to a qualified overbidder. Pursuant to the PSA, the Expense Reimbursement will also constitute super-priority administrative expense claims pursuant to 11 USC § 503(b) and 507(a) against Karamanos, and shall not be subject to subordination or proration.

13.     Karamanos also seeks authority to implement the following bidding procedures and overbid protections, and to provide the proposed Bid Procedures Notice appended as Exhibit A to the proposed Order that is attached hereto as **Exhibit 2.**

14.     Subsequent to the filing of this Motion, Karamanos will file a Notice of Intent to sell property to the Successful Bidder.  Given that by the time the hearing on the Bidding Procedures is conducted, Karamanos will already have served the Notices of Intent on the entire mailing matrix, Karamanos believes that service of the Notice of Bidding Procedures can be limited to service upon:  (i) the United States Trustee for the District of Oregon, (ii) counsel to the Official Committee of Unsecured Creditors, (iii) Debtors' secured creditors and their counsel, (iv) counsel to the Initial Bidder, (v) the Internal Revenue Service, (vi) the Oregon Department of Revenue, (vii) the Securities and Exchange Commission, (viii) the US Attorney's Office, (ix) those parties having filed a notice of appearance and request for special notice pursuant to FRBP 2002, (x) those parties having expressed a bona fide interest in entering into a proposed transaction with Karamanos for the sale of the Acquired Assets, and (xi) all non-debtor parties to

MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

executory contracts and leases, (xii) any other party that may express an interest in bidding on the Acquired Assets, and (xiii) any other party that NBP Capital wants to receive notice.

15.     A paramount goal of any proposed sale or use of property of the bankruptcy estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize procedures intended to enhance competitive bidding that are consistent with the goal of maximizing value received by the estate and therefore appropriate in the context of bankruptcy sales.  Karamanos believes the proposed bidding procedures, overbid protections, expense reimbursement obligations set forth herein are fair, reasonable, necessary and appropriate in order to facilitate the prompt and efficient sale of the Acquired Assets.

WHEREFORE, Karamanos requests that this Court enter an order approving the bidding procedures, overbid protection, and expense reimbursement obligations requested herein, and provide that notice of the bidding procedures shall be provided to those parties as set forth above.

DATED:  November 29, 2018

MOTSCHENBACHER & BLATTNER LLP


By:/s/Nicholas J. Henderson
    Nicholas J. Henderson, OSB #074027
    Of Attorneys for Debtor-in-Possession
    Karamanos Holdings, Inc.

MOTION FOR APPROVAL OF BIDDING PROCEDURES, OVERBID PROTECTION AND BREAK-UP FEE AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

**EXHIBIT 1**
PURCHASE AND SALE AGREEMENT

{00225814:4}

# REAL ESTATE PURCHASE AND SALE AGREEMENT

THIS REAL ESTATE PURCHASE AND SALE AGREEMENT (the "**Agreement**") is dated as of November 27, 2018 (the "**Effective Date**"), by and between **Karamanos Holdings, Inc., as the Debtor in Possession, Case Nos. 18-31644-pcm11 and 18-31646-pcm11** (the "**Seller**") and NBP Capital, LLC and/or its assigns (the "**Buyer**,"). In this Agreement, the Buyer and Seller are each referred to as a "Party," and are collectively referred to as the "Parties."

## RECITALS

A. Seller is the owner of the real property, fixtures, and improvements commonly known as 801, 915 and 959 NE 21st Ave., Portland, Oregon, and more particularly described on Exhibit A attached hereto, together with all related permits, documents, rights, and books and records in Seller's possession or reasonable control (the "**Real Property**").

B. Seller is the debtor in bankruptcy case number 18-31646-pcm11, which is jointly administered with lead case no. 18-31644-pcm11, both of which are pending in the United States Bankruptcy Court for the District of Oregon (together, the "**Bankruptcy Cases**").

C. Buyer desires to purchase from Seller, and Seller desires to sell to Buyer the Real Property. The terms of this Agreement are as follows:

## AGREEMENT

**1.** **Purchase and Sale.** Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the Real Property, free and clear of all liens, claims, rights, interests, debts, liabilities, and encumbrances, other than the Land Lease Agreement between Sunshine Foods, Inc. and Verizon Wireless (VAW) LLC dated May 16, 2017 (the "**Lease**") upon the terms and conditions set forth in this Agreement.

**1.1** **Purchase Price.** The purchase price for the Real Property shall be Eight Million One Hundred Thousand Dollars ($8,100,000) (the "**Purchase Price**"). Subject to the terms of this Agreement, on or before the Closing Date (as hereafter defined), Buyer shall deposit into escrow cash, a wire transfer of funds, a certified check, or a cashier's check, in the amount of the Purchase Price.

**1.2** **Assumed Obligations**. In connection with Buyer's purchase of the Real Property, Buyer will assume only those obligations of Seller first arising under the Lease after the Closing Date. Seller will have fully performed all of its obligations under the Lease, and paid any amounts necessary to cure any defaults or breaches under the Lease at or before the Closing Date. All other liabilities and obligations of Seller of any kind or nature will remain the sole obligation of Seller. For the avoidance of doubt, Buyer is not assuming and shall not be responsible for any of Seller's other liabilities, debts, or obligations, whether such liabilities are known, unknown, matured, unmatured, contingent, noncontingent, or otherwise. Buyer is not purchasing any personal property.

**1.3    Earnest Money.**  Within three (3) business days of the date of this Agreement, Buyer shall deposit into escrow with Escrow (as defined in Section 2.1) an amount equal to Six Hundred Thousand Dollars ($600,000), which amount shall constitute earnest money with respect to this transaction (the "**Earnest Money**").  The Earnest Money shall be credited against the Purchase Price at the Closing.  Subject to the conditions and requirements in the next sentence, (1) One Hundred Thousand Dollars ($100,000) of the Earnest Money shall become nonrefundable at 5 PM PT on the date that is seven (7) days after the Effective Date (the "**Initial Feasibility Deadline**"), and (2) the remaining Five Hundred Thousand Dollars ($500,000) of the Earnest Money ("**Remainder EM**") shall become nonrefundable upon the Due Diligence Deadline Date (as defined in Section 7.1) if Buyer does not terminate the Agreement with written notice to Seller on or before such time.  If this Agreement is terminated, then the Earnest Money shall be returned to Buyer in accordance with the following: (1) if Buyer elects to the terminate the Agreement before the Initial Feasibility Deadline, the entire Earnest Money shall be refunded to Buyer; (2) if this Agreement is terminated by either party at any time (i) following the failure of any of the conditions set forth in Sections 7.2 through 7.9, (ii) upon Seller's failure to convey the Real Property to Buyer as provided herein by the Outside Date, other than as a result of Buyer's default hereunder, or (iii) pursuant to Section 16.1 or Section 18 (except subsection 18.8), the entire Earnest Money shall be refunded to Buyer; and (2) to the extent not described above, if Buyer terminates this Agreement after the Initial Feasibility Deadline and before the Due Diligence Deadline Date, then the Remainder EM shall be refunded to Buyer. In the event Buyer fails to consummate its purchase of the Real Property in accordance with this Agreement notwithstanding the satisfaction or waiver of all conditions to Buyer's obligation to do so, the Earnest Money shall be retained by Seller as liquidated damages and shall constitute Seller's sole remedy against Buyer on account of such failure to consummate this transaction.  Seller and Buyer acknowledge and agree that the damages that would be incurred by Seller on account of such a failure to close by Buyer would be difficult to ascertain with reasonable certainty and that the amount of the Earnest Money constitutes a reasonable approximation of such damages and not a penalty.

**2.    Escrow.**

**2.1    Opening of Escrow**.  Buyer and Seller shall deliver a fully executed copy of this Agreement to Ticor Title Company of Oregon ("**Escrow**"), Attention Candice Weischedel.  Escrow shall act as escrow agent for the administration of this Agreement.

**2.2    Escrow Instructions**.  Buyer and Seller hereby authorize their respective attorneys to execute and deliver to Escrow any additional or supplemental instructions as may be necessary or convenient to implement the terms of this Agreement and to close this transaction.  In the event of any conflict between such additional or supplemental instructions and the express terms of this Agreement, the terms of this Agreement shall control.

**2.3    Closing Date.**  This transaction shall close no earlier than February 1, 2019, and no later than February 15, 2019 (the "**Closing**" or "**Closing Date**"), provided that all contingencies to Closing have been satisfied.

3. **Title Commitment.**

3.1 **Obligation:** Within five (5) business days after the Effective Date, Seller, at Seller's cost and expense, shall cause Escrow to issue to Buyer its preliminary title report on the Real Property (the "**Preliminary Commitment**"), along with copies of all documents that give rise to exceptions listed in the report (the "**Underlying Documents**").

3.2 **Buyer's Title Notice**: Within ten (10) days of receiving the Preliminary Commitment and the Underlying Documents, Buyer shall give Seller written notice ("**Buyer's Title Notice**") setting forth the exceptions that are not acceptable to Buyer (the "**Unacceptable Exceptions**"). If Buyer fails to provide the Buyer's Title Notice within the required time period, then Buyer shall be deemed to have waived his right to send Buyer's Title Notice and accepted the Preliminary Commitment. All exceptions in the Preliminary Commitment (but not any updated or revised title commitment) other than Unacceptable Exceptions shall be deemed acceptable to Buyer (**"Permitted Exceptions"**). For purposes of the title insurance, Permitted Exceptions shall include all of the standard printed exceptions in the policy jacket but excluding any Schedule B general exceptions that are typically removed from an ALTA extended coverage owners title policy**.**

3.3 **Seller's Title Notice**: Seller shall have five (5) days after receiving Buyer's Title Notice within which to give Buyer Seller's written notice ("**Seller's Title Notice**") agreeing to eliminate some or all of the Unacceptable Exceptions or declining to eliminate some or all of the Unacceptable Exceptions. If Seller agrees to eliminate the Unacceptable Exceptions, Seller shall be obligated to do so at its cost and on or before the Closing Date. If Seller fails to provide the Seller's Title Notice within the required time period, then Seller shall be deemed to have declined to remove the Unacceptable Exceptions shown in the Buyer's Title Notice. Without the need and regardless of any objections by Buyer, Seller shall eliminate, on or before Closing, all exceptions to title with respect to liens and encumbrances that can be satisfied and released by the payment of money.

3.4 **Buyer's Final Title Notice**: If Seller does not agree or is deemed to not agree to remove all of the Unacceptable Exceptions in Seller's Title Notice, then Buyer may elect, by written notice ("**Buyer's Final Title Notice**") given to Seller prior to the Due Diligence Deadline Date, to either (i) terminate this Agreement, or (ii) waive Buyer's objections to the Unacceptable Exceptions and proceed with the transaction contemplated by this Agreement. If Buyer fails to provide Buyer's Final Title Notice within the required time period, then Buyer shall be deemed to have waived the right to terminate this Agreement under this Section. If Buyer elects to terminate this Agreement, then the Earnest Money shall be returned to Buyer in accordance with Section 1.3 and the parties shall have no further rights or obligations hereunder, except those that expressly survive termination.

4. **Site Study Review.**

4.1 Between the Effective Date and the Due Diligence Deadline Date (the "**Feasibility Period**"), Buyer may engage consultants or engineers of Buyer's choosing to conduct non-invasive site studies, including without limitation, a property survey, property condition report, and environmental assessments of the Real Property as Buyer deems necessary.

Upon reasonable notice to Seller, Buyer or its agents shall have the right to enter the Real Property at reasonable times before the Closing Date to make such tests, inspections, studies, and other investigations as Buyer may require, at Buyer's expense and risk. Buyer shall defend, indemnify and hold Seller harmless from any loss, damage, or claim (collectively, "**Claims**") arising out of Buyer's access to the Real Property for the purpose of making tests, inspections, studies, and other investigations; provided, however, Buyer's indemnity and defense obligation shall not extend to protect Seller from any Claims to the extent such Claim is attributable to the acts or omissions of Seller, its officers, directors, principals, employees, contractors, representatives or agents or is due to pre-existing conditions on the Real Property merely discovered by Buyer. Seller shall have the right to be present at any time that Buyer or Buyer's agents are on the Real Property.

   **4.2**  During the Feasibility Period, Buyer shall secure, pay for, and provide Commercial General Liability (occurrence basis) with unimpaired limits of $2,000,000 per occurrence limit. Such insurance shall be written on an occurrence form and shall be primary; any coverage maintained by Seller shall be excess and non-contributing to Buyer's insurance procured hereunder. During the Feasibility Period, Buyer shall be the named insured and Seller shall be named as an additional insured. Such insurance shall protect Buyer and all additional insureds against liability for bodily injury, death and property damage arising out of Buyer's exercise of its right of access to the Real Property by itself, its employees, agents and contractors. During the Feasibility Period, Buyer's insurer shall at all times be licensed and qualified to do business in the state of Oregon and shall have A+ or better rating by the latest edition of A.M. Best's Insurance Rating Service. Buyer shall deliver evidence of such coverages to Seller within ten (10) days following the Effective Date. The provisions of this Section 4 shall survive Closing and/or termination of this Agreement.

   **4.3**  Within three (3) Business Days after the Effective Date, Seller will furnish to Buyer or make available for Buyer's review legible copies of all existing documentation as it relates to the Real Property, to the extent in Seller's possession or reasonable control, including but not limited to: (a) plans; (b) engineering plans and reports; (c) written covenants and restrictions applicable to the Real Property; (d) notices, demands, and other communications from governmental agencies; (e) permits and variances issued by governmental authorities; (f) copies of all tax and assessment bills for the two (2) most recent tax years; (g) environmental, soils and geological reports; (h) utility bills covering the past twelve (12) months; (i) written easement or right-of-way agreements, or other interests or agreements related thereto, to the extent not being delivered by Escrow in its preliminary title report; (j) existing surveys; (k) the Lease; (l) any other documents, books or records relating to the Real Property reasonably requested by Buyer; but expressly excluding (i) materials that would disclose Seller's cost of acquisition of the Real Property, or cost of construction of any improvements and related soft costs, (ii) any reports, presentations, summaries and the like prepared for any of Seller's boards, committees, partners or investors in connection with its consideration of the acquisition of the Real Property, construction of any improvements or sale of the Real Property, (iii) any proposals, letters of intent, draft contracts or the like prepared by or for other prospective purchasers of the Real Property or any part thereof, (iv) Seller's internal memoranda, attorney-client privileged materials, appraisals, property condition reports, and (v) any information which is the subject of a confidentiality agreement between Seller and a third party (collectively, the "**Due Diligence Materials**").

5.      **No Financing conditions**.

Buyer's obligation to close is not subject to financing.

6.      **Seller's Contingencies.**  Seller's obligation to close this transaction shall be subject to:

6.1      **No Default.**  Buyer is not in default of Buyer's covenants, representations or warranties under this Agreement and all contingencies of closing which are for benefit of Seller have been satisfied.

6.2      **Deliveries.**  Buyer's delivery to Escrow on or before the Closing Date, for disbursement as provided herein, of the Purchase Price, and the documents and materials described in this Agreement.

7.      **Buyer's Contingencies.**  Buyer's obligation to close this transaction shall be subject to:

7.1      **Due Diligence Contingency.**  Buyer's obligation to close this transaction shall be subject to Buyer's approval, in Buyer's sole discretion, with the results of Buyer's due diligence review of the Real Property and Buyer's intended use thereof in accordance with Sections 3 and 4, and Buyer's review and acceptance of appropriate UCC-11 Reports (the "**Due Diligence Contingencies**") and the satisfaction or waiver by Buyer of such Due Diligence Contingencies on or before 5 PM PT on the date that is thirty (30) days after the Effective Date (the "**Due Diligence Deadline Date**").  If Buyer is not satisfied with the Due Diligence Contingencies, Buyer may deliver to Seller a written notice terminating this Agreement on or before the Due Diligence Deadline Date.  If Buyer does not deliver to Seller a written notice terminating this Agreement on or before the Due Diligence Deadline Date, then the Buyer shall be deemed to have waived the Due Diligence Contingencies.  If Buyer terminates this Agreement, then Escrow shall return the Earnest Money to Buyer in accordance with Section 1.3 and the parties shall have no further rights and obligations, except those that expressly survive termination.

7.2      **Seller's Deliveries.**  Seller's delivery to Escrow, on or before the Closing Date, of all of the documents and materials described in this Agreement to be delivered by Seller at Closing.

7.3      **Bid Procedures Order**.  No later than December 31, 2018, the Bankruptcy Court shall have entered the Bid Procedures Order (as defined in Section 17.1.2 below) approving the bid procedures, and such order shall be a final order and in form and substance reasonably satisfactory to Buyer and shall be final and non-appealable, and shall not have been stayed, appealed, withdrawn or vacated (the "**Final Bid Procedures Order**").

7.4      **Bankruptcy Court Sale Order**.  No later than January 31, 2018, the Bankruptcy Court shall have entered an order (the "**Sale Order**") approving the sale of the Real Property to Buyer and such order shall be a final order and in form and substance reasonably satisfactory to Buyer and shall be final and non-appealable, and shall not have been stayed, appealed, withdrawn or vacated ("**Final Sale Order**").

**7.5    No Default.**  Seller is not in default of or has failed to perform or comply with any of Seller's covenants, representations or warranties under this Agreement and all contingencies of closing which are for benefit of Buyer have been satisfied.

**7.6    Compliance with Law.** There shall be no order, decree, or ruling by any court or  governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

**7.7    Government Consents.** There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other action, as may be required to consummate the transactions contemplated by this Agreement by any regulatory authority having jurisdiction over the parties and the actions herein proposed to be taken, including but not limited to requirements under applicable federal and state securities laws.

**7.8    No Litigation.** No litigation or proceeding shall be threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement.

**7.9    Compliance with Final Sale Order**.  As of the Closing Date, the Seller shall have complied with all of the terms and conditions of the Final Sale Order.

**8.    Deliveries to Escrow.**

**8.1    By Seller to Escrow.**  On or before the Closing Date, Seller shall deliver the following in escrow to Escrow:

**8.1.1    Deed.**  A Statutory Warranty Deed, duly executed and acknowledged in recordable form by Seller, in the form of <u>Exhibit B</u>, conveying the Real Property to Buyer.

**8.1.2    Lease Assignment**.  An Assignment Agreement, duly executed by Seller, in the form of <u>Exhibit C</u>, by which Seller assigns all of its interest in and to the Lease, and by Buyer assumes all obligations thereunder after the Closing Date.

**8.1.3    Nonforeign Certification.**  Seller represents and warrants that it is not a "foreign person" as defined in IRC §1445.  Seller will give an affidavit to Buyer to this effect in the form of <u>Exhibit D</u>.

**8.1.4    Miscellaneous**.  Such other documents in Seller's possession or reasonable control as are necessary and appropriate to consummate the transactions contemplated herein, as reasonably requested by Buyer or his counsel.

**8.1.5    Tenant Estoppel**.  Seller shall deliver an estoppel certificate, in a form attached hereto as Exhibit F, except to the extent that Buyer's lender or the Lease requires a different form, from the tenant of the Real Property (the

"Tenant"). The estoppel certificate shall include a representation by Tenant that Seller is not in breach of, and has fully performed all of Seller's obligations under, the Lease as of the Closing Date. Buyer and Seller agree that they will not unreasonably withhold approval of revisions to the form of estoppel certificate set forth on Exhibit F if Buyer's acquisition financing lender requires revisions thereto.

    **8.1.6 Contracts**. Seller shall deliver at Closing notices of termination of all Service Contracts (defined in Section 16.3) and leases that are not the Lease.

  **8.2 By Buyer to Escrow.** On or before the Closing, Buyer shall deliver the following in escrow to Escrow:

    **8.2.1 Remaining Purchase Price.** The remainder of the Purchase Price.

    **8.2.2 Lease Assignment and Assumption**. An Assignment and Assumption Agreement, duly executed by Buyer, in the form of Exhibit C, by which Seller assigns all of its interest in and to the Lease, and by Buyer assumes all obligations thereunder first arising after the Closing.

    **8.2.3 Prorations.** The amount due Seller, if any, after the prorations are computed in accordance with Section 12 below.

**9. Deliveries to Buyer at Closing.**

  **9.1 Possession of Real Property**. Seller shall deliver to Buyer exclusive possession of the Real Property at Closing, subject only to the obligations under the Lease first arising after Closing. Seller shall remove all personal property from the Real Property prior to Closing, unless otherwise specifically provided for in this Agreement.

  **9.2 Other Documents**. All other documents and things required to be delivered to Buyer under this Agreement.

**10. Title Insurance.** At Closing, Seller shall provide to Buyer an irrevocable commitment from Escrow to issue a standard coverage owner's title insurance policy in the amount of the Purchase Price, insuring title for the Real Property vested in Buyer, subject only to the Permitted Exceptions (the "**Title Policy**"). At Closing, Seller shall pay for the cost of a standard policy, and Buyer shall pay for the costs of any additional extended coverage and endorsements that are desired by Buyer. Seller shall reasonably cooperate with Buyer and Escrow in the issuance to Buyer of ALTA extended coverage and any endorsements requested by Buyer.

**11. Adjustments.** Seller shall pay for the standard coverage title insurance policy, one-half of all escrow fees and costs, the broker fee due to CBRE pursuant to a separate agreement, any real property transfer or excise taxes, and Seller's share of prorations pursuant to Section 12 below. Buyer shall pay one-half of all escrow fees and costs, recording charges related to the Real Property, extended coverage and endorsement premiums for the Title Policy, and Buyer's share of prorations pursuant to Section 12 below. Buyer and Seller shall each pay

their own legal and professional fees of other consultants incurred by Buyer and Seller, respectively. All other costs and expenses shall be allocated between Buyer and Seller in accordance with Multnomah County, Oregon practice. At Closing, Buyer shall contribute any additional funds necessary to pay its share of adjustments.

## 12. Prorations.

    **12.1**     **Operating Expenses**. All costs and expenses with respect to the operation and maintenance of the Real Property (collectively, "**Operating Expenses**"), shall be prorated such that Seller shall be responsible for all Operating Expenses attributable to the period prior to the Closing Date and Buyer shall be responsible for all Operating Expenses attributable to the period from and after the Closing Date. If invoices or bills for any such costs and expenses are unavailable on or before the Closing Date, such costs and expenses shall be estimated and prorated at Closing based upon the latest information available (including prior bills and operating history) and a final and conclusive readjustment of any cost and expense item shall be made upon receipt of the actual invoice or bill, but in all events no later than one hundred eighty (180) days following the Closing Date. Subject to any requirements of the Tenant under the Lease, Buyer shall take all steps necessary to effectuate the transfer of all utilities to Buyer's name as of the date of the Closing date, and where necessary, open a new account in Buyer's name and post deposits with the utility companies. Buyer and Seller shall cooperate to have all utility meters read by the appropriate utility companies as of the Closing Date. If Buyer and Seller are unable to obtain final meter readings as of the Closing Date from all applicable meters, such expenses shall be estimated at Closing based upon the operating history of the Real Property subject to the final adjustment in all events no later than one hundred eighty (180) days following the Closing. Seller shall be entitled to recover any and all deposits held by any utility companies as of the Closing Date, and if any such deposits are not returned to Seller on or before the Closing Date and are assigned to Buyer, such amounts shall be credited to Seller's account and increase the amount of funds payable by Buyer at Closing.

    **12.2**     **Rent**. All rental income and pre-paid rent from the Lease shall be prorated such that Seller shall be entitled to any such payments due and payable prior to the Closing Date (the "**Seller Rent**"), and Buyer shall be entitled to any such payments due and payable on or after the Closing Date (the "**Buyer Rent**"). With respect to any rent payments actually received by Seller prior to Closing which cover a period after Closing, Buyer shall receive a credit against the Purchase Price equal to the prorated rent amount applicable to such period after Closing. Buyer shall receive a credit at Closing in the amount of any then unapplied tenant security deposits in Seller's possession. Any payments received by Buyer after the Closing Date, shall be deemed a payment of rent due after the Closing until the Tenant is current on rents and sums due under the Lease on or after the Closing, and then such payments shall be paid to Seller to the extent of any rent or other sums owing to Seller for periods prior to Closing. Buyer shall have no obligation to make any attempts to recover the Seller Rent. Seller shall have no right to sue the Tenant to collect rent after Closing. Reconciliations of taxes, insurance charges and other expenses owed by Tenant under the Lease for the calendar year (or fiscal year if different from the calendar year) in which the Closing occurs shall be prepared by Buyer with the cooperation of Seller within 180 days following the end of such year in accordance with the requirements set forth in the Lease and as provided in this paragraph.

**12.3     Method of Proration.** Except as otherwise provided in this Agreement, all prorations shall be made in accordance with customary practice in Multnomah County, Oregon except as provided herein.  Such prorations, if and to the extent known and agreed on as of the Closing Date, shall be paid by Buyer to Seller (if the prorations result in a net credit to Seller) or by Seller to Buyer (if the prorations result in a net credit to Buyer) by increasing or reducing the cash to be paid by Buyer at Closing.  Any such prorations not determined or not agreed on as of the Closing Date shall be paid by Buyer to Seller, or by Seller to Buyer, as the case may be, in cash as soon as practicable following the Closing Date.

**13.     Seller's Representations, Warranties and Covenants.** Seller represents and warrants to Buyer as of the Effective Date and the Closing Date as follows:

**13.1     Corporate Existence and Power**. Seller is a corporation, duly organized and validly existing under the laws of the State of Oregon.   Seller has full power and authority to own, operate, and sell the Real Property.

**13.2     Validity of Contemplated Transaction**. Neither the execution and delivery of this Agreement nor the consummation of the transactions provided for in this Agreement violate any agreement to which Seller is a party or by which Seller is bound, or any law, order, or decree or any provision of any Seller's governing documents.

**13.3     Condemnation**.  Seller has received no written notice of any pending or contemplated condemnation actions with respect to the Real Property.  Seller has received no written notice of any pending or contemplated special assessments with respect to the Real Property.

**13.4     Possession.** Except for the Lease, there are no parties in possession of any portion of the Real Property as lessees, tenants at sufferance or trespassers.

**13.5     Compliance with Laws**. Seller has received no written notice from any governmental authority of any violation of any applicable law, statute, ordinance, rule, regulation, order or determination of any governmental authority affecting the Real Property (hereinafter sometimes collectively called "**Applicable Laws**"), including without limitation any Applicable Laws pertaining to health, safety or the environment.

**13.6     Litigation Proceedings**. Seller has received no written notice of any litigation pending with respect to the Real Property or Seller which impairs Seller's ability to perform its obligations under this Agreement.

**13.7     Due Diligence Materials**. To Seller's knowledge:  (i) full and complete copies of the Due Diligence Materials have been or will be delivered to Buyer in accordance with this Agreement; (ii) the Lease is in full force and effect; (iii) Seller has received no written notice of any default by Seller with respect to such Lease, which has not been cured; (iv) the closing of the transaction contemplated by this Agreement, including the assignment and assumption of the Lease and the termination of the Service Contracts, will not result in a breach of the Lease and Service Contracts; and (v) the Tenant is in material default under its Lease beyond any applicable cure period.

**13.8    OFAC**.  Seller and all beneficial owners of Seller are in compliance with the requirements of Executive Order No. 13224, 66 Fed Reg. 49079 (September 25, 2001) and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury and in any enabling legislation or other Executive Orders in respect thereof.

**13.9    Authority and Consents.**  Seller has full power and authority to enter into this Agreement, and following the entry of the Final Sale Order, Seller will have full power and authority to carry out the transactions contemplated by this Agreement. This Agreement and its execution and delivery to Buyer have been duly authorized by Seller and constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

**13.10    Title to Assets.**  Seller has, and upon delivery to Buyer on the Closing Date of documents necessary or desired by Buyer to complete the transactions contemplated herein, Seller will thereby transfer to Buyer good and marketable title to, all of the Real Property free and clear of all liens, claims, rights, interests and encumbrances, except the Permitted Exceptions.

**13.11    Accuracy of Representations and Warranties.**  The representations and warranties of Seller set forth herein shall be true, complete, and accurate in every material respect on and as of the Closing Date with the same force and effect as if they had been made at the Closing Date, except for changes contemplated by this Agreement and except for those representations and warranties that address matters only as of a particular date (which shall remain true and correct as of such particular date), with the same force and effect as if they had been made at the Closing.

**14.    "AS IS" Sale**.  Except as expressly set forth in this Agreement or any document delivered at Closing, Seller is selling and Buyer is acquiring the Real Property **AS IS, WHERE IS**, with all faults and defects, whether patent or latent.  Except as expressly set forth in this Agreement or any document delivered at Closing, Seller has not made any other representations, express or implied, regarding the Real Property and Buyer has not relied on any.  Buyer acknowledges that any and all information, feasibility or marketing reports, environmental or physical condition reports, or other information of any type that Buyer has received or may receive from Seller or Seller's agents is furnished on the express condition that Buyer shall or would make an independent verification of the accuracy of any and all such information, all such information being furnished without any warranty whatsoever.  Buyer shall rely upon its own inspection and its own professional advisors in its examination of the Real Property, and all improvements thereon.  Buyer hereby represents, warrants, and covenants to Seller that, Buyer has conducted its own investigation of the Real Property and the physical condition thereof, including, without limitation, accessibility and location of utilities, use of hazardous materials on, from, or under the Real Property, earthquake preparedness of the Real Property, all matters concerning the Real Property with respect to taxes, assessments, income and expense data, bonds, permissible uses, zoning, covenants, conditions and restrictions, and other matters which in Buyer's respective judgment are necessary or advisable or might affect or influence Buyer's use of the Real Property after Closing, or bear upon the value and suitability of the Real Property for Buyer's intended purposes, or Buyer's willingness to enter into this Agreement.  Buyer

recognizes that Seller would not sell the Real Property except on an as is, where is basis, and that except as expressly set forth in this Agreement or any document delivered at Closing, acknowledges that Seller has made no representations or warranties of any kind in connection with the Real Property.  Buyer expressly waives all claims it may have against Seller in any way relating to the Real Property or the condition of each item included therein, with the sole exception of Buyer's claims for breach of this Agreement, the Final Sale Order, or claims under the deed, bills of sale or other documents or instruments being delivered by Seller.  Except as expressly set forth in this Agreement, the Final Sale Order, or any document delivered at or in connection with Closing, Buyer and anyone claiming by, through or under Buyer hereby fully and irrevocably waives and releases Seller and each of its shareholders, employees, officers, managers, representatives, attorneys, agents, successors and assigns (collectively "released party") from any and all claims that it may now have or hereafter acquire against any released party for and against any costs, losses, demands, penalties, fines, liens, judgments, injuries, liabilities, damages, expenses, demands, claims, actions or causes of action, whether direct or indirect, known or unknown, foreseen or unforeseen, arising from or related to the Real Property, or any portion thereof, and/or any construction defects, errors, omissions, or other conditions, latent or otherwise, geotechnical and seismic, affecting the Real Property, or any portion thereof, including, without limitation the environmental condition of the Real Property or any law applicable thereto.

15. **Buyer's Representations and Warranties.**  In addition to any express agreements of Buyer contained here, the following constitute representations and warranties of Buyer to Seller:

15.1      Buyer has the legal power, right, and authority to enter into this Agreement and the instruments referred to herein and to consummate the transactions contemplated here.

15.2      All requisite action (corporate, trust, partnership, or otherwise) has been or will be taken by the Buyer in connection with entering into this Agreement and the instruments referred to herein and the consummation of the transactions contemplated herein.  After taking such action, no further consent of any partner, shareholder, member, manager, creditor, investor, judicial or administrative body, governmental authority, or other party is required.

15.3      The persons executing this Agreement and the instruments referred to herein on behalf of Buyer have the legal power, right, and actual authority to bind such Buyer to the terms and conditions of this Agreement.

15.4      This Agreement and all documents required by it to be executed by Buyer are and shall be valid, legally binding obligations of, and enforceable against Buyer in accordance with their terms.

15.5      There is no action pending or, to Buyer's knowledge, currently threatened against it that seeks to prohibit the transactions contemplated by this Agreement or adversely affect its ability to perform under this Agreement.

**15.6**     Neither the execution and delivery of this Agreement and documents referred to herein, nor the incurring of the obligations set forth here, nor the consummation of the transactions contemplated, nor compliance with the terms of this Agreement and the documents referred to herein conflicts with or results in the material breach of any terms, conditions, or provisions of or constitute a default under any bond, note, or other evidence of indebtedness, or any contract, indenture, mortgage, deed of trust, loan, partnership agreement, lease, or other agreements or instruments to which any Buyer is a party.

**16.     Ongoing Operations; Damage or Destruction; Condemnation.**

**16.1     Damage or Destruction; Condemnation**.  Until the Closing Date, the risk of loss shall be retained by Seller.  Seller shall keep the Real Property fully insured until Closing.  In the event all or any material portion of the Real Property are damaged, destroyed, or condemned or threatened with condemnation before the Closing Date, Buyer may terminate this entire Agreement and the entire Earnest Money shall be returned to Buyer.  Any termination must be of the entire Agreement, and cannot be a partial termination with respect to a portion of the Real Property.  In such event, escrow will be terminated, this Agreement shall have no further force or effect whatsoever.  If Buyer does not elect to terminate this entire Agreement as a result of casualty or condemnation, this entire Agreement shall remain in full force and effect, including, without limitation, the Buyer's obligation to close this transaction as provided for here and to pay the full Purchase Price to Seller less any cost of repairs to be paid by the Buyer acquiring the particular item needing repair, if any, to the extent not covered by insurance or condemnation proceeds.  In such event, the Buyer shall be assigned all insurance proceeds or condemnation proceeds payable to or for the account of Seller.  The Buyer shall have the right to terminate its obligations under this Agreement in accordance with the provisions of this Section 16.  For purposes of this Agreement, "a material portion" is five percent (5%) or more of the Real Property, in either land square footage, improvement square footage, overall value or income from tenants.

**16.2     Ongoing Operations**.  During the pendency of this Agreement, Seller shall carry on its business and activities relating to the Real Property, shall comply with the terms of the Lease and cause the Tenant to comply with the terms of the Lease, substantially in the same manner as it did before the Effective Date of this Agreement and shall not amend or terminate the Lease without the written consent of Buyer.  During the pendency of this Agreement:

(a)     Seller shall not, without the prior written consent of Buyer transfer any part of the Real Property, grant or convey any easements, liens, mortgages, encumbrances, or other interests in the Real Property, or seek or agree to any changes to the zoning classification of the land;

(b)     Seller shall maintain in full force and effect insurance policies relative to the Real Property similar to those in effect before the Effective Date of this Agreement; and

(c)     Seller shall use good faith efforts to promptly furnish Buyer copies of all notices of violation of applicable law received by Seller.

**16.3     Service Contracts**.  On or prior to Closing, Seller will terminate all existing contracts related to the construction, operation or management of the Real Property (collectively, "**Service Contracts**") as to which Buyer shall have no liability whatsoever.

**17.     Additional Covenants**

**17.1     Bankruptcy Sale Process.**

**17.1.1**  Seller will, within 5 business days after the Effective Date, file with the Bankruptcy Court the Bidding Procedures Motion in the form attached hereto as <u>Exhibit E</u> (the "**Bidding Procedures**"), which shall include the Stalking Horse Provisions described in Section 17.2 below.

**17.1.2**  Seller has filed or will within 5 business days after the order approving the Bidding Procedures (the "**Bid Procedures Order**") is entered in the Bankruptcy Court, file a motion to sell the Real Property (the "**Sale Motion**"), notices and proposed orders, the Motion to Assume Lease attached hereto as Exhibit G (the "**Lease Motion**") and a copy of the transaction documents (with any redactions Seller and Buyer mutually deem appropriate in accordance with Bankruptcy Rule 9018 and the Bid Procedures Order), in form and content reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of the Final Sale Order. The Sale Motion shall include a request that the Final Sale Order include the following findings of fact, among other things:

(a)     that this Agreement was negotiated at arms-length, its terms are fair and reasonable, and the Buyer has acted in good faith and without collusion or fraud of any kind;

(b)     Buyer is not an "insider" or "affiliate" of the Seller as those terms are defined in the Bankruptcy Code;

(c)     neither the Seller nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code with respect to the consummation of the purchase transaction;

(d)     Buyer is purchasing the Real Property in good faith within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code;

(e)     notice of the sale (and any required sale procedures), was sent to all creditors and interested parties, was reasonable and adequate, and is sufficient to comply with notice requirements of the Bankruptcy Code, the Bankrtpucy Rules, and the local rules of the Bankrtupcy Court for the District of Oregon;

(f)     all objections to the sale free and clear of liens, claims, rights, interests, debts, liabilities, and encumbrances, other than the Lease, have been withdrawn or overruled, and the Buyer therefore purchases the Real Property

free and clear of all liens, claims, rights, interests, debts, liabilities, and encumbrances, other than its obligations first arising after the Closing under the Lease;

(g)    that the Buyer is buying the Real Property Property under section 363(f)  the  free and clear of all liens, claims, rights, interests, debts, liabilities, and encumbrances, other than its obligations first arising after the Closing under the Lease

(h)    Buyer is released from any and all potential liability in connection with the purchase of the Real Property, other than its obligations first arising after the Closing under the Lease;

(i)    the stay under Bankruptcy Rules 6004(h) and 6006(b) has been waived; and

(j)    the sale is in the best interests of creditors.

**17.1.3**  Seller shall serve a copy of the Sale Motion on:

(a)    all entities that claim any interest in or Lien upon the Real Property;

(b)    all parties to the Lease;

(c)    all governmental taxing authorities that have or as a result of the sale of the Real Property may have claims, contingent or otherwise, against the Seller;

(d)    all parties that filed requests for notices under Bankruptcy Rule 901(b) or were entitled to notice under Bankruptcy Rules 2002 and 6004;

(e)    all creditors or holders of claims (as defined in Section 101(5) of the Bankruptcy Code, whether or not liquidated, contingent, disputed, or unmatured) of the Seller;

(f)    all interested governmental, pension, environmental and other regulatory entities;

(g)    the Attorney General of the State of Oregon;

(h)    the Office of the United States Trustee;

(i)    the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Seller;

(j)    all persons and entities that expressed to the Seller an interest in purchasing the Real Property;

(k)    the Creditors Committee and its counsel; and

(l)      such other persons and entities that Buyer designates should receive notice.

**17.1.4**  Seller will, subject to the provisions of this Agreement and the Bidding Procedures Order, in consultation with Buyer, (x) respond to and cause to be overruled all timely objections to the entry of the Bid Procedures Order and the Final Sale Order and (y) obtain entry of the Final Sale Order on or before January 31, 2019.

**17.1.5**  Buyer will use its reasonable best efforts to assist Seller in Seller obtaining entry of the Final Sale Order, including furnishing or filing with the Bankruptcy Court such affidavits or declarations as Seller may reasonably request for the purpose of obtaining entry of the Final Sale Order.

**17.2**    Stalking Horse Provisions.

**17.2.1**  In the event Seller receives, in accordance with the Bid Procedures Order, a Qualified Bid from a Qualified Bidder (as such terms are defined in the Bid Procedures Order) to consummate sale of the Real Property to a third-party bidder on terms that include a cash purchase price, payable at closing, of an amount at least $250,000 greater than the sum of (x) the Purchase Price *plus* (y) the maximum amount of the Expense Reimbursement (as defined below), and which terms are otherwise substantially the same as, or more favorable to Seller than the terms set forth in this Agreement (an "**Alternative Transaction**"), Seller shall notify Buyer in writing.  Thereafter, Seller will conduct an auction in accordance with the Bid Procedures Order.

**17.2.2**  In the event Seller either enters into an agreement to consummate, or consummates, an Alternative Transaction, Seller shall upon the earlier of the foregoing events, pay Buyer, in accordance with the Bidding Procedures by wire transfer to an account designated in writing by Buyer the sum of all reasonable costs and expenses of Buyer incurred in connection with Buyer's efforts to negotiate and consummate the transactions contemplated by this Agreement (including, without limitation, the fees and expenses of counsel), but such reimbursement shall be capped at $225,000 (the "**Expense Reimbursement**"), and (iii) the entire Earnest Money.

**17.2.3**  Seller shall pay the Expense Reimbursement from estate assets, and if the estate assets are insufficient to pay the Expense Reimbursement in full, then from any proceeds of an Alternative Transaction, otherwise payable to Seller.

**17.2.4**  The Expense Reimbursement (to the extent due and owing) shall be a first-priority administrative expenses of Seller's bankruptcy estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code and not be subject to subordination or proration.

**17.2.5**  The obligation of Seller to pay, and the payment by Seller of, the Expense Reimbursement (to the extent due and owing), shall in no way limit or otherwise affect the rights of Buyer to a return of the Earnest Money, including without limitation the rights of Buyer under Section 1.3 of this Agreement.

**17.2.6**  Seller acknowledges and agree that Buyer would not have entered into this Agreement but for the provisions in this <u>Section 17.2</u>, and that the provisions of this <u>Section 17.2</u> are integral to, and shall survive any termination of, this Agreement.

**18.**  **Termination of Agreement**.  This Agreement may be terminated at any time prior to the Closing as follows:

**18.1**  by the mutual written consent of Seller and Buyer;

**18.2**  by Seller, upon or immediately prior to the consummation of an Alternative Transaction as a result of any auction conducted in accordance with the Bidding Procedures, but only if Seller performs its obligations under Section 17.2;

**18.3**  by either Buyer or Seller, if the Closing shall not have been closed prior to February 15, 2019 (the "**Outside Date**"); provided, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Seller, then Buyer (if Buyer is in breach) or Seller (if Seller is in breach), respectively, may not terminate this Agreement pursuant to this Section 18.3;

**18.4**  by either Buyer or Seller, if (a) the Bidding Procedures Order has not been entered by the Bankruptcy Court, or if the Stalking Horse Provisions have not been approved by the Bankruptcy Court by the close of business on December 31, 2018, (b) the Bidding Procedures Order has been appealed, withdrawn, revoked, rescinded, or modified, or (c) the Bidding Procedures Order has not become a final, non-appealable order within fifteen (15) calendar days following the date on which it was entered;

**18.5**  by either Buyer or Seller, if there shall be any law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a governmental body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any such adverse determination which is appealable (and pursue such appeal with reasonable diligence);

**18.6**  by Buyer, if either or both of the Chapter 11 Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code;

**18.7**  by Buyer, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on January 31, 2019, (b) the Sale Order has been appealed, withdrawn, revoked, rescinded, or modified, or (c) the Sale Order has not become a final, non-appealable order within fifteen (15) calendar days following the date on which it was entered;

**18.8** by Seller, if Buyer fails to satisfy any of its material obligations at Closing and, to the extent such breach is reasonably capable of cure, such breach has not been cured by Buyer within five (5) business days after written notification by Seller (and Closing shall be extended if necessary to accommodate such cure period) or

**18.9** by Buyer, if Seller is in breach of or fails to satisfy any of its material obligations hereunder and, to the extent such breach is reasonably capable of cure, such breach has not been cured by Seller within five (5) business days after written notification by Buyer (and Closing shall be extended if necessary to accommodate such cure period).

**19.    Procedure Upon Termination**.  In the event of a termination of this Agreement by Buyer or Seller, or both, (a) written notice thereof shall be given promptly by the terminating party to the other party or parties hereto, specifying the provision hereof pursuant to which such termination is made, (b) this Agreement shall thereupon terminate and become void and of no further force and effect, and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto.  If this Agreement is terminated as provided herein, all parties shall return all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

**20.    Effect of Termination**.  In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, all of the parties shall be relieved of their duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without liability to Buyer or Seller; provided, however, that Section 18, Section 19, this Section 20, Section 21, Section 17.2, and Section 26.7 hereof, and any other provisions hereof necessary to implement the provisions of such sections, shall survive any such termination and shall be enforceable hereunder.  In no event shall any termination of this Agreement relieve any party hereto of any liability for any willful breach of this Agreement by such party.  For avoidance of doubt, upon termination of this Agreement, (a) the Earnest Money shall be delivered to any applicable party as provided in Section 1.3 and (b) Buyer shall be entitled to the Stalking Horse Provisions to the extent set forth in Section 17.2.

**21.    Notices.**  All notices or other communications required or permitted under this Agreement shall be in writing and shall be (a) personally delivered (including by means of professional messenger service), which notices and communications shall be deemed received on receipt at the office of the addressee; (b) sent by registered or certified mail, postage prepaid, return receipt requested, which notices and communications shall be deemed received three days after deposit in the United States mail; (c) sent by overnight delivery using a nationally recognized overnight courier service, which notices and communications shall be deemed received one business day after deposit with such courier; (d) if a fax number is shown below, sent by fax, which notices and communications shall be deemed received on the delivering party's receipt of a transmission confirmation, or (e) if an e-mail address is shown below, sent by email, which notices and communications shall be deemed received on the delivering party's receipt of a transmission confirmation.

**To Buyer:**          NBP Capital, LLC
                       9 SE 3rd Avenue Suite 100

Portland, OR 97214
lauren@nbpcapital.com
Attention: Lauren Noecker

With a copy to:    Hathaway Larson LLP
                   1331 NW Lovejoy Street, Suite 950
                   Portland, Oregon 97209
                   jeni@hathawaylarson.com
                   Attention: Jeni Meyer

                   Sussman Shank LLP
                   1000 SW Broadway
                   Suite 1400
                   Portland, Oregon 97205
                   hlevine@sussmanshank.com
                   Attention: Howard M. Levine

**To Seller:**      Karamanos Holdings, Inc.
                   c/o Boverman and Associates, LLC
                   11285 SW Walker Rd.
                   Portland, OR 97225
                   Attention: Dan Boverman
                   Email: danboverman@boverman.biz

                   and

                   Karamanos Holdings, Inc.
                   c/o Norman Davidson III
                   630 West Duarte Road, #208
                   Arcadia, California 91007

With a copy to:    Karamanos Holdings, Inc.
                   c/o Nicholas J. Henderson
                   Motschenbacher & Blattner LLP
                   117 SW Taylor, Suite 200
                   Portland, OR 97204
                   Email address: nhenderson@portlaw.com

Notice of change of address shall be given by written notice in the manner detailed in this section.

**22.    Broker.**  Seller shall pay any brokerage commission due to CBRE in connection with the sale of the Real Property ("**Seller's Broker**") in accordance with any agreement between Seller and Seller's Broker.  Seller agrees to hold Buyer harmless and indemnify Buyer from and against any and all liabilities (including reasonable attorneys' fees, expenses and disbursements) suffered or incurred by Buyer as a result of any claims by Seller's Broker or any

other party claiming to have represented Seller as broker in connection with the transaction. Buyer agrees to hold Seller harmless and indemnify Seller from and against any and all liabilities (including reasonable attorneys' fees, expenses and disbursements) suffered or incurred by Seller as a result of any claims by any other broker claiming to have represented Buyer as broker in connection with the transaction. The provisions of this section shall survive the Closing (and not be merged therein) or the earlier termination of this Agreement.

23. **Required Actions of Buyer and Seller.** Prior to and after Closing, Buyer and Seller agree to execute all such instruments and documents and to take all actions pursuant to the provisions of this Agreement in order to consummate the purchase and sale contemplated and shall use reasonable efforts to close the transactions contemplated in this Agreement in accordance with the provisions herein.

24. **Limitation of Buyer's Remedies and Damages**. Buyer acknowledges that Seller is acting solely through the authority of the Bankruptcy Court, and Buyer therefore agrees that Buyer's sole and absolute remedy if Seller defaults in its obligation to sell and convey the Real Property to Buyer shall be to terminate this Agreement and obtain a refund of the Earnest Money deposited by Buyer and any amounts due under Sections 17.2 and 26.7. Under no circumstance shall Seller or anyone acting by, for or through Seller be liable to Buyer or Buyer's heirs, successors or assigns, for direct, indirect, consequential, incidental, punitive or exemplary damages, or damages of any other kind arising out of or related to Seller's default in its obligations to sell and convey the Real Property to Buyer. Buyer further acknowledges and agrees that Seller would not be willing to enter into this Agreement without Buyer's agreement to the foregoing limitation of remedies and damages.

25. **Assignment.** Buyer shall not have the right to assign its rights or obligations under this Agreement without the prior written consent of Seller**,** provided that Buyer may assign this Agreement to an entity which is controlled by Buyer or an affiliated entity, such as a manager, member, or limited partner, without obtaining the consent of Seller. Any attempted assignment without the prior written consent of Seller shall be void and Buyer shall be deemed in default hereunder. Any authorized assignee shall succeed to all the rights and remedies under this Agreement, including but not limited to the specific performance of this Agreement. Notwithstanding the foregoing, no such assignment shall relieve Buyer from its liability under this Agreement. In the event of assignment, the assignor waives notice, presentment, any defenses arising from subsequent modification of this Agreement, and any defenses other than those that may be raised by the assignee.

26. **Miscellaneous.**

26.1 **Partial Invalidity.** If any term or provision of this Agreement or the application to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law. However, if any term or provision of this Agreement becomes invalid or unenforceable such that the Parties cannot close the transaction on the entirety of the Real Property, the entire Agreement shall become invalid and unenforceable.

**26.2    Waivers.**  No waiver of any breach of any covenant or provision contained here shall be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision herein contained.  No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act.

**26.3    Exhibits.**  The exhibits referenced in this Agreement are a part of this Agreement as if fully set forth in this Agreement.

**26.4    Survival of Representations.**  The covenants, agreements, representations, and warranties made herein shall survive the Closing Date and shall not merge into the deed or the recordation of it in the official records, or the delivery at Closing of any assignment of leases, general assignment, or bill of sale.

**26.5    Successors and Assigns.**  This Agreement shall be binding on and shall inure to the benefit of the permitted successors and assigns of the parties to it.

**26.6    Electronic Signatures.**  Facsimile or PDF transmission of any signed original document, and retransmission of any transmission, will be the same as delivery of an original, but the party transmitting a signature by facsimile or PDF then must send the original signature by overnight delivery service to the other party.  This Section shall not apply to any document that must be recorded.

**26.7    Attorney Fees.**  In the event a party to this Agreement brings any action or suit against another party to this Agreement by reason of any breach of any of the covenants, agreements, or provisions on the part of the other party arising out of this Agreement, then in that event the prevailing party shall be entitled to have and recover from the other party all costs and expenses of the action or suit, including reasonable attorney fees, at trial and on appeal.

**26.8    Entire Agreement.**  This Agreement (including any exhibits attached to it) is the final expression of, and contains the entire agreement between the parties with respect to the subject matter of the Agreement and supersedes all prior understandings with respect to it.  This Agreement may not be modified, changed, supplemented, or terminated, nor may any obligations under it be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted here.  The parties do not intend to confer any benefit on any person, firm, or corporation other than the parties hereto.

**26.9    Counterparts**.  This Agreement may be executed in counterparts, each of which will be considered an original and all of which together will constitute one and the same agreement.

**26.10    Time of Essence.**  Seller and Buyer hereby acknowledge and agree that time is strictly of the essence with respect to each and every term, condition, obligation, and provision.

26.11    **Construction.**  Headings at the beginning of each section are solely for the convenience of the parties and are not a part of this Agreement.  Whenever required by the context of this Agreement, the singular shall include the plural, and the masculine shall include the feminine, and vice versa.  This Agreement shall not be construed as if it had been prepared by one of the parties, but rather as if both parties had prepared it.  Unless otherwise indicated, all references to Sections are to this Agreement.  Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless the last day is a Saturday, Sunday, or legal holiday, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, nor legal holiday.  As used in this Agreement, "business day" means a day other than a Saturday, Sunday or legal holiday.

26.12    **Governing Law.**  The parties acknowledge that this Agreement has been negotiated and entered into in the state of Oregon.  The parties expressly agree that this Agreement shall be governed by, interpreted under, and construed and enforced in accordance with the laws of the state of Oregon.

26.13    **Jurisdiction**.

26.13.1  Prior to the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably (a) consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding, and (b) waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.

26.13.2  Upon the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Oregon, and each of the Parties hereby irrevocably (a) consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding, and (b) waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

**26.14** **STATUTORY LAND USE DISCLAIMER.** THE PROPERTY DESCRIBED IN THIS INSTRUMENT MAY NOT BE WITHIN A FIRE PROTECTION DISTRICT PROTECTING STRUCTURES. THE PROPERTY IS SUBJECT TO LAND USE LAWS AND REGULATIONS THAT, IN FARM OR FOREST ZONES, MAY NOT AUTHORIZE CONSTRUCTION OR SITING OF A RESIDENCE AND THAT LIMIT LAWSUITS AGAINST FARMING OR FOREST PRACTICES, AS DEFINED IN ORS 30.930, IN ALL ZONES. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO VERIFY THE EXISTENCE OF FIRE PROTECTION FOR STRUCTURES AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

The foregoing language is included for the purpose of compliance with Oregon statutory requirements only, and is not intended to affect, limit or impair the rights and obligations of the parties under any other terms and conditions of this Agreement.

*[Signature Page Follows.]*

IN WITNESS WHEREOF, the parties have executed this Agreement.

**SELLER:**                                    **BUYER:**

**Karamanos Holdings, Inc., as the Debtor**    **NBP Capital, LLC**
**in Possession of the Estate of Karamanos**   a Delaware limited liability company
**Holdings, Inc. in Case No. 18-31646-**
**pcm11, jointly administered with Case**      By: Noecker, LLC, its manager
**No. 18-31644-pcm11**

By: _____          _____
      Norman Davidson III, President            Lauren Noecker, Manager

Date  _11/29/2018_____               Date  _____

IN WITNESS WHEREOF, the parties have executed this Agreement.

**SELLER:**                                    **BUYER:**

**Karamanos Holdings, Inc., as the Debtor**    **NBP Capital, LLC**
**in Possession of the Estate of Karamanos**   a Delaware limited liability company
**Holdings, Inc. in Case No. 18-31646-**
**pcm11, jointly administered with Case**      By: Noecker, LLC, its manager
**No. 18-31644-pcm11**

By: _____              _____
     Dan Boverman, Chief Restructuring    Lauren Noecker, Manager
     Officer

Date _____             Date  11/20/18 _____

**EXHIBIT A**

**REAL PROPERTY LEGAL DESCRIPTION**

[TO BE ATTACHED]

{00225761:2}

Exhibit 1 - Page 25 of 39
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

**DEED**

AFTER RECORDING, RETURN TO:

_____

_____

Until a change is requested, send all tax statements to:

_____

_____

## STATUTORY WARRANTY DEED

      **Karamanos Holdings, Inc., as the Debtor in Possession of the Estate of Karamanos Holdings, Inc., Case No. 18-31646-pcm11, jointly administered in the Lead Case No. 18-31644-pcm11** ("**Grantor**"), conveys and warrants to _____, a _____ corporation with a mailing address at _____ ("**Grantee**") the real property and improvements commonly known as _____ Portland, Oregon described in the attached **Exhibit 1** free of encumbrances except as specifically set forth herein**.**

      The true consideration for this conveyance is $8,100,000.

BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. THIS INSTRUMENT DOES NOT ALLOW USE OF THE PROPERTY DESCRIBED IN THIS INSTRUMENT IN VIOLATION OF APPLICABLE LAND USE LAWS AND REGULATIONS. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO DETERMINE ANY LIMITS ON LAWSUITS AGAINST FARMING OR FOREST PRACTICES, AS DEFINED IN ORS 30.930, AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

{00225761:2}

**Exhibit 1 - Page 26 of 39**
Case 18-31644-pcm11   Doc 572   Filed 11/30/18

Dated: _____, 2019.

**SELLER:**

**Karamanos Holdings, Inc., as the Debtor in Possession of the Estate of Karamanos Holdings, Inc., Case No. 18-31646-pcm11, jointly administered in the Lead Case No. 18-31644-pcm11**

By: _____
    Dan Boverman, Chief Restructuring Officer

Date _____

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me this ___ day of _____, 2019, by **Dan Boverman, Chief Restructuring Officer of Karamanos Holdings, Inc., Debtor in Possession of the Estate of Karamanos Holdings, Inc.  Case No. 18-31646-pcm11, jointly administered with Lead Case No. 18-31644-pcm11.**

_____
Notary Public for _____
My Commission Expires: _____

**EXHIBIT 1**

**TO DEED**

**LEGAL DESCRIPTION**

[TO BE ATTACHED]

{00225761:2}

Exhibit 1 - Page 28 of 39
Case 18-31644-pcm11   Doc 572   Filed 11/30/18

# EXHIBIT C

## LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

### ASSIGNMENT OF LEASE

This instrument is executed and delivered as of the ____ day of _____, 2019, pursuant to that certain Purchase and Sale Agreement ("Agreement"), dated _____, 2018, by and between _____, a _____ ("Seller"), and _____, a _____ ("Buyer"), covering the real property described in Exhibit A attached hereto ("Real Property").

　　　　1.　　　Assignment of Lease.　For good and valuable consideration, Seller hereby assigns, transfers, sets over and conveys to Buyer, and Buyer hereby accepts such assignment of, the following (the "Assigned Property"): All of the Seller's right, title and interest in and to the lease described in Exhibit A attached hereto (the "Lease") covering the Real Property, and Buyer hereby assumes all of the Seller's obligations under the Lease, first arising after the Closing Date (as defined in the Agreement).

　　　　2.　　　Assumption.　Buyer hereby assumes the obligations of Seller under the Lease first arising after the Closing Date and shall defend, indemnify and hold harmless Seller from and against any liability, damages, causes of action, expenses, and attorneys' fees incurred by Seller by reason of the failure of Buyer to fulfill, perform, discharge, and observe its obligations with respect to the Lease arising on and after the Closing Date.　Seller shall defend, indemnify and hold harmless Buyer from and against any liability, damages, causes of action, expenses, and attorneys' fees incurred by Buyer by reason of the failure of Seller to fulfill, perform, discharge, and observe its obligations with respect to the Lease arising before the Closing Date. The indemnities in this paragraph are subject to the following limitation: Any such claims by Seller or Buyer must be raised within one (1) year from the Closing Date.

　　　　3.　　　Agreement Applies.　The covenants, agreements, representations, warranties, indemnities and limitations provided in the Agreement with respect to the property conveyed hereunder (including, without limitation, the limitations of liability provided in the Agreement), are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Buyer and Seller and their respective successors and assigns.

　　　　IN WITNESS WHEREOF, the undersigned have caused this Assignment of Lease to be executed as of the date written above.

SELLER:

By: _____
Name: _____
Title: _____

BUYER:

By: _____
Name: _____
Title: _____

# EXHIBIT D

## SELLER'S CERTIFICATION OF NONFOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person. To inform NBP Capital, LLC ("transferee") that withholding of tax is not required upon the transfer of the U.S. real property interest in the City of Portland, County of Multnomah and the State of Oregon, commonly known as and by the street address by Karamanos Holdings, Inc., an Oregon corporation ("transferor"), the undersigned hereby certifies the following (if transferor is an entity, on behalf of the transferor):

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the U.S. Internal Revenue Code and Treasury Department Regulations);

2. Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii);

3. Transferor's U.S. taxpayer identification number is 93-1265173; and

4. Transferor's office address is _____.

The transferor understands that this certificate may be disclosed to the Internal Revenue Service, that any false statement contained in this certificate may be punished by fine or imprisonment or both, that transferee is relying on this certificate in determining whether withholding is required, and that transferee may face liabilities if any statement in this certificate is false.

Transferor hereby indemnifies transferee from any liability or cost which transferee may incur as a result of (1) the Seller's failure to pay any U.S. Federal income tax which such transferor is required to pay under applicable U.S. law or (2) any false or misleading statement contained in this certification.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete (and, for an entity transferor, I further declare that I have the authority to sign this document on behalf of transferor).

**Karamanos Holdings, Inc., as the Debtor in**
**Possession of the Estate of Karamanos Holdings,**
**Inc., Case No. 18-31646-pcm11, jointly administered**
**in the Lead Case No. 18-31644-pcm11**


By: _____
    Dan Boverman, Chief Restructuring Officer


Date _____

{00225761:2}

Exhibit 1 - Page 30 of 39
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

**EXHIBIT E**

BIDDING PROCEDURES

[Attached as Exhibit A to Proposed Order]

# EXHIBIT F
# TENANT ESTOPPEL CERTIFICATE

THIS TENANT ESTOPPEL CERTIFICATE is made and entered into on _____, 2018, by _____ ("Tenant"), in favor of NBP _____, LLC and its successors and assignees ("Purchaser"). Tenant acknowledges that Purchaser is relying on this certificate in purchasing the property covered by Tenant's lease.

1.	Tenant confirms that its lease with _____ dated _____, 20____ (the "Lease"), has been properly executed and delivered by Tenant, is valid and binding on Tenant, has not been assigned or modified, and is in full force and effect. The term of the Lease commenced _____, 20____, is scheduled to expire _____, 20____, and the current base rent under the Lease is $_____ per month. Attached to this certificate is a true, complete, and accurate copy of the Lease.

2.	Tenant is in possession and has accepted the condition of the premises described in the Lease (the "Premises"), any obligation of the landlord to improve the Premises has been fulfilled, and except as stated in the Lease, the landlord has no obligation to repair, alter, or expand the Premises.

3.	Tenant has not paid any rent to the landlord more than one (1) month in advance, and there exist no rent concessions, allowances, rebates, or abatements, nor does Tenant have any defense against or offset to the payment of rent.

4.	Tenant has paid a $_____ security deposit to the landlord.

5.	To the best of Tenant's knowledge, there exist no defaults under the Lease by the landlord or Tenant, and Tenant has no knowledge of any facts or circumstances that, following the expiration of any applicable notice or cure period, would constitute such a default.

6.	Tenant has no contract, right of first refusal, or option to purchase any of the Premises, and no right to extend the Lease term, expand or relocate the Premises, or terminate the Lease.

7.	Any notices that Purchaser gives to Tenant will be effective if delivered or mailed to the address adjacent to Tenant's signature on this certificate, and any notices that Tenant gives to Purchaser will be delivered or mailed to _____.

8.	This certificate will bind and inure to the benefit of the respective successors and assigns of Tenant and Purchaser.

Tenant's Address:	TENANT:

_____	By: _____

_____	Name: _____

_____	Its: _____

**\*24929-001\NBP - WEST PURCHASE AGREEMENT (NJH 110918) 11122018 (03025436);2**

**EXHIBIT G**

LEASE MOTION

{00225761:2}

Exhibit 1 - Page 33 of 39
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

Nicholas J. Henderson, OSB #074027
nhenderson@portlaw.com
MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor St., Suite 300
Portland, OR 97204
Telephone: (503) 417-0508
Facsimile: (503) 417-0528

Of Attorneys for Karamanos Holdings, Inc.,
Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Bankruptcy Case Nos. |
| Sunshine Dairy Foods Management, LLC and | 18-31644-pcm11 (Lead Case) |
| Karamanos Holdings, Inc., | 18-31646-pcm11 |
| | DEBTOR'S MOTION TO ASSUME AND ASSIGN EXECUTORY CONTRACT AND DETERMINE CURE AMOUNT |
| Debtors-in-Possession. | |

Debtor-in-Possession, Karamanos Holdings, Inc. ("KHI" or "Debtor"), requests entry of an

order (1) authorizing Debtor to assume and assign the unexpired Land Lease Agreement dated May

16, 2017, by and between Debtor, as Landlord, and Verizon Wireless (VAW), LLC d/b/a Verizon

Wireless, as tenant (the "Contract"), and for a determination of the cure amounts on such Contract.

In support of this Motion, Debtor represents as follows:

      1.     On May 9, 2018 (the "Petition Date"), Debtor filed voluntary a petition under Chapter

11 of the United States Bankruptcy Code. The Debtor's case is jointly administered under case

number 18-31644-pcm11.

      2.     Pursuant to Sections 1107 and 1108 of the Code, Debtor is continuing in possession of

its property and is operating and managing its business as a debtor-in-possession.

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the standing order of reference of the District Court.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.     Debtor seeks authority to assume and assign the Contract and a determination on a cure amount, if any, for such Contract.

5.     The assumption and assignment of the Contracts at this time on the terms stated below are appropriate and in the best interests of Debtor's estate.

6.     Pursuant to Code Sections 365 and 105, Debtor requests authority to assume and assign the Contract pursuant to terms of the proposed Order to be submitted by Debtor.

## BACKGROUND

7.     On the Petition Date, Debtor and Sunshine Dairy Foods Management, LLC ("Sunshine") (collectively, the "Debtors") filed two (2) voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  KHI manages Sunshine and related properties as debtors-in-possession pursuant to §§1107(a) of the Bankruptcy Code. No request for appointment of an examiner has been made, no request to remove Debtors as debtors-in-possession has been made, and no committees have been appointed or designated.

8.     KHI owns 94% of the outstanding membership interest of Sunshine.  KHI also owns Sunshine Dairy Enterprises, Inc. ("SDE").  SDE owns the remaining 6% of Sunshine's outstanding membership interest.

9.     Sunshine is a limited liability company headquartered in Portland, Multnomah County, Oregon.  KHI is an Oregon corporation headquartered in Portland, Multnomah County, Oregon.  Debtors are in the business of manufacturing, packaging, and distributing dairy, non-dairy,

DEBTOR'S MOTION TO ASSUME AND ASSIGN EXECUTORY
CONTRACT AND DETERMINE CURE AMOUNT

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Exhibit 1 - Page 35 of 39
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

and other related food products throughout the United States of America.  The Debtors are the

successors to the dairy delivery business founded in 1935 by John Karamanos.

10.    KHI has executed a Real Estate Purchase and Sale Agreement with NBP Capital, LLC

("NBP Capital") dated November 26, 2018 (the "PSA") for the sale of certain assets to NBP Capital

(as defined in the APA, the "Acquired Assets").

11.    On _____, 2018, the Bankruptcy Court entered the Order Approving Bidding

Procedures, Overbid Protection, Break Up Fee, and Form and Manner of Notice of Sale (together

with the Bidding Procedures attached thereto, the "Bid Procedures Order").

12.    On _____, 2018, Debtor served a Notice of Intent to Sell Property,

Compensate Broker, and/or Pay any Secured Creditor's Fees and Costs; Motion for Authority to Sell

Property Free and Clear of Liens; and Notice of Hearing ("Sale Notice") and a Notice of Intent to

Assume and Assign Executory Contracts and Determine Cure Amounts; Notice of Hearing Thereon

("Assumption Notice"). In accordance with the Sale Notice, Assumption Notice, PSA, and Bid

Procedures Order, Debtor intends to seek approval of a sale of the Acquired Assets to NBP Capital or

such other bidder as may be the Successful Bidder (as defined in the Bid Procedures Order) before

the Court on _____, 2019.

13.    KHI intends to assume and assign the Contract to (a) NBP Capital, or (b) the

Successful Bidder.  Debtor seeks to have the order attached as **Exhibit C** considered at a hearing

before the Court on _____, 2019 in conjunction with the hearing on the sale of the

Acquired Assets set forth in the Sale Notice.

## CONTRACTS TO BE ASSUMED AND ASSIGNED

14.    The following table lists, with respect to the Contract, the amounts that the Debtor has

determined will be, as of the closing date of the sale to NBP Capital or other Successful Bidder, as

Page 3 of 6    DEBTOR'S MOTION TO ASSUME AND ASSIGN EXECUTORY
CONTRACT AND DETERMINE CURE AMOUNT
{00226460:4}

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

**Exhibit 1 - Page 36 of 39**
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

the case may be, the amounts necessary to be paid by the Debtor pursuant to Section 365 of the

Bankruptcy Code in order to cure any existing breaches and default in accordance with Sections

365(b) and 365(f)(2) of the Bankruptcy Code or to provide any adequate assurance of future

performance required under Section 365(b)(1)(C) of the Bankruptcy Code and assume and assign

such Contract to NBP Capital or the Successful Bidder (the "Cure Amount"):

| Lease Counterparty | Cure Amount |
|---|---|
| Verizon Wireless (VAW), LLC d/b/a Verizon Wireless | $0.00 |

15.     The Debtor is not in default or breach of the Contract, and the only obligations due

under the Lease are the Cure Amount.

16.     On _____, 2018, additional parties may seek to become "Qualified

Bidders" and submit "Qualified Bids" to the Debtor as those terms are defined in the Bid Procedures

Order. One of the requirements of a Qualified Bid is that the Qualified Bidder submits a complete list

of executory contracts and unexpired leases to be assumed and assigned in accordance with its

proposed bid.

17.     Debtor will provide the Contract counterparty notice of the Qualified Bids that

propose to assume and assign the Contract to the Qualified Bidder.  The counterparty to the Contract

will have until _____, 2018 (the "Contract Objection Deadline") to object to the

assumption and assignment of the Contract and the proposed Cure Amount.

18.     A final determination of whether the Contract will be assumed and assigned to the

Successful Bidder will be made at the conclusion of the bidding process on _____, 2018.

Debtor intends to reject any executory contracts that are not assigned to the purchaser of the assets.

DEBTOR'S MOTION TO ASSUME AND ASSIGN EXECUTORY
CONTRACT AND DETERMINE CURE AMOUNT

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

{00226460:4}

Exhibit 1 - Page 37 of 39
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

**RELIEF REQUESTED**

19.     Any objection by the Contract counterparty must be filed and served upon the Debtor by the Objection Deadline and must specify the grounds for such objection, including stating the alleged cure amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged cure amount) if the counterparty disagrees with the proposed Cure Amount and any other defaults or termination events that the counterparty alleges must be cured to effect assumption and assignment of the Contract.

20.     Unless the Contract counterparty properly and timely files an objection to the assumption of the Contract by the Objection Deadline, the Debtor may assume and assign the Contract in accordance with the provisions of the PSA and this Motion, subject to the occurrence of the closing, without further order or notice of hearing, subject only to the payment of the Cure Costs (as set forth in the PSA or any other purchase agreement approved by the Court, as applicable).  If an objection is filed and served by the Objection Deadline, and the objection cannot be resolved consensually, then the objection shall be heard at the sale hearing.

21.     The Debtor requests that unless the Contract counterparty files an objection to this Motion and also asserts a claim for any amounts due and owing, or other obligations under the Contract in an amount different than the Cure Amount referenced in this Motion (the "Disputed Cure Amount") by the Objection Deadline, the Contract counterparty shall be forever barred from asserting a Cure Amount different from that set forth in this Motion and from asserting any additional cure, other amounts, breaches, damages, claims or defaults with respect to the Contract, relating to the period prior to assignment to the Successful Bidder.

DEBTOR'S MOTION TO ASSUME AND ASSIGN EXECUTORY
CONTRACT AND DETERMINE CURE AMOUNT

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Exhibit 1 - Page 38 of 39
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

22.     Pursuant to the Bid Procedures Order, the second or otherwise best qualified bid submitted by the bid deadline as modified by a bidder at the auction, shall remain open and irrevocable through the consummation of the final agreements and closing of the sale with the Successful Bidder. The Debtor intends to seek a conditional order approving the assumption and assignment of the Contract to the Successful Bidder. To the extent the Successful Bidder fails to close then the conditional order will provide that the Contract shall be assumed and assigned to the second highest bidder subject to the terms of the Bid Procedures Order.

23.     KHI asserts that assumption and assignment of the Contract and adoption of the objection deadline and other procedures described herein is appropriate and in the best interest of its estate.

24.     Debtor requests that the 14-day stay provided by Bankruptcy Rule 6006(d) be waived.

WHEREFORE, KHI requests an order authorizing KHI's assumption and assignment of the Land Lease Agreement with Verizon Wireless (VAW), LLC dated May 16, 2017, on the terms set forth above, and for such further relief as the Court deems just and proper.

Dated _____, 2018          MOTSCHENBACHER & BLATTNER LLP

By:/s/ EXHIBIT_____
    Nicholas J. Henderson, OSB No. 074027
    Of Attorneys for Debtor-in-Possession
    Karamanos Holdings, Inc.

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

**EXHIBIT 2**
PROPOSED ORDER

{00225814:3}

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Bankruptcy Case Nos. |
| SUNSHINE DAIRY FOODS MANAGEMENT, LLC and KARAMANOS HOLDINGS, INC. | 18-31644-pcm11 (Lead Case) |
| | 18-31646-pcm11 |
| | ORDER APPROVING BIDDING PROCEDURES, OVERBID PROTECTIONS AND EXPENSE REIMBURSEMENTS, AND AND FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES |
| Debtors-in-Possession. | |

This matter is before the Court on the Motion for Order Approving Bidding Procedures,

Overbid Protections, Expense Reimbursements, and Form and Manner of Notice of Bidding

Procedures ("Motion") (Dkt No. ____) filed by Karamanos Holdings, Inc. ("Karamanos" or

"Debtor"). The Court having held a hearing on the Motion on _____, 2018, and having

considered the submissions and arguments of counsel and the files and records herein, and being now

fully advised of the premises,

ORDER APPROVING BIDDING PROCEDURES, OVERBID
PROTECTIONS AND EXPENSE REIMBURSEMENTS, AND
FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

{00225972:2}

Exhibit 2 - Page 1 of 15
Case 18-31644-pcm11   Doc 572   Filed 11/30/18

THE COURT FINDS as follows:

A.       This Court has core jurisdiction over Debtors' chapter 11 cases ("Bankruptcy Cases"), this Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.       The notice provided regarding the Motion and the hearing on the Motion and the bidding procedures described therein and attached hereto as **Exhibit A** ("Bid Procedures") constitutes sufficient and adequate notice.  No other or further notice in connection with the entry of this Order is or shall be required.

C.       The Bid Procedures were proposed by Debtor in good faith with the goal of maximizing the value of the Acquired Assets (defined below) for the benefit of creditors and the estate. Karamanos has articulated good and sufficient reasons for authorizing and approving the Bid Procedures attached hereto as **Exhibit A**, which are reasonable and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Acquired Assets.

D.       The Bid Procedures (including the Expense Reimbursement as defined in the PSA) are fair and reasonable. The Bid Procedures represent an exercise of Karamanos' sound business judgment and will facilitate an orderly sale process, and are in the best interests of the estate.

E.       On or about November 27, 2018, the Karamanos entered into an Real Estate Purchase and Sale Agreement (the "PSA") with NBP Capital, LLC ("Purchaser") providing for the sale of Debtor's West Plant real estate, improvements and related assets. The PSA is attached as Exhibit 1 to the Motion. The assets to be sold include the real property, fixtures, and improvements commonly known as 801, 915 and 959 NE 21st Ave., Portland, Oregon, and more particularly described on Exhibit A to the PSA, together with all related permits, documents, rights, and books and records in

{00225972:2}

ORDER APPROVING BIDDING PROCEDURES, OVERBID
PROTECTIONS AND EXPENSE REIMBURSEMENTS, AND
FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Exhibit 2 - Page 2 of 15
Case 18-31644-pcm11   Doc 572   Filed 11/30/18

Seller's possession or reasonable control, as more specifically described and defined in the PSA ("Acquired Assets").

F.      Entry of this Order is in the best interests of Debtors, their estates, creditors, and other parties in interest.

NOW THEREFORE, IT IS HEREBY ORDERED as follows:

1.      The Motion is GRANTED. The Bid Procedures attached as **Exhibit A** are hereby approved and shall be used in connection with the proposed sale of the Acquired Assets.

2.      All responses or objections to the relief requested in the Motion concerning the Bid Procedures and the Notice Procedures that have not been withdrawn, waived, settled or resolved at the _____, 2018 hearing are overruled.

3.      Debtor has filed a motion seeking approval of a sale of the Acquired Assets to Purchaser or a Successful Bidder other than Purchaser, resulting from the process described in the Bid Procedures, free and clear of liens, claims, interests, and encumbrances and the assumption and assignment of leases and executory contracts (Dkt No. _____) (the "Sale Motion").  Any objections to the proposed sale shall be filed no later than _____, 2018 ("**Objection Deadline**"). Objections must be in writing, be filed with this Court and served on the following parties: (a) Karamanos Holdings, Inc., Attn:  Attn:  Daniel Boverman, CFO, 11285 SW Walker Rd., Portland, OR  97225; (b) Nicholas J. Henderson, Motschenbacher & Blattner, LLP, 117 SW Taylor St., Suite 300, Portland, OR 97204, counsel for Debtor Karamanos Holdings, Inc.; (c) Sunshine Dairy Foods Management, LLC, Attn:  Daniel Boverman, CFO, 11285 SW Walker Rd., Portland, OR  97225; (d) Douglas R. Ricks, Vanden Bos & Chapman, LLP, 319 SW Washington, Ste 520, Portland, OR 97204, counsel for Debtor Sunshine Dairy Foods Management, LLC;  (e) the Office of the United States Trustee for the District of Oregon, 620 SW Main Street, Suite 213, Portland OR 97205; (f)

Page 3 of 6

{00225972:2}

ORDER APPROVING BIDDING PROCEDURES, OVERBID
PROTECTIONS AND EXPENSE REIMBURSEMENTS, AND
FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Exhibit 2 - Page 3 of 15
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

Howard N. Levine, Sussman Shank LLP, 1000 SW Broadway, Suite 1400, Portland, OR 97205; and

(g) Jeni Meyer, Hathaway Larson LLP, 1331 NW Lovejoy St., Ste. 950, Portland, OR 97209

("Notice Parties").  Any party filing an objection to the Sale Motion must attend the hearing on the

Sale Motion (the "Sale Approval Hearing") and advocate its objection at such hearing. Any

objection not filed, served, and/or advocated in accordance with this paragraph shall be deemed

waived and shall be forever barred.

4.      Any Auction (as defined in the Motion) for the Acquired Assets will be held on

_____, 2018, at __:__ _.m. Pacific Time, at the offices of Motschenbacher & Blattner,

LLP, 117 SW Taylor St., Suite 300, Portland, OR 97204.

5.      The Sale Approval Hearing will be conducted on _____, 2019, at __:__

_.m. Pacific Time, in United States Bankruptcy Court for the District of Oregon, at: 1050 SW 6th

Avenue #700, Courtroom # 1, Portland, OR 97204, at which time Debtor will present for approval

by this Court the Successful Bid (as defined in the Bid Procedures) (if there is an Auction) or the

PSA with the Purchaser (if there is not an Auction), pursuant to the provisions of Sections 105,

363(b), 363(f), 363(m), 365 and 1146(a) of the Bankruptcy Code. Debtor shall be deemed to have

accepted a bid only when the bid for the Acquired Assets has been approved by the Court at the

Sale Approval Hearing

6.      The Expense Reimbursement obligation (the "Expense Reimbursement")

presented in Paragraph 12 of the Motion and contained and defined in the PSA are approved.

Karamanos is authorized to pay the Expense Reimbursement of up to $225,000 to compensate

Purchaser for its reasonable out-of-pocket expenses paid to third parties and reasonable amounts

incurred by Purchaser (including overhead expenses) in pursuing a purchase of the Acquired

Assets.  The Expense Reimbursement shall be treated as a first priority administrative expense

ORDER APPROVING BIDDING PROCEDURES, OVERBID
PROTECTIONS AND EXPENSE REIMBURSEMENTS, AND
FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Exhibit 2 - Page 4 of 15
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

claims in the Bankruptcy Cases under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, and is not subject to subordination or proration.

7.      . Further, the Expense Reimbursement shall be paid as a cost of sale from the proceeds at closing and set aside in escrow or a trust account pending notice and an opportunity to object.  Such payment shall be prior to the payment of the proceeds of such sale to any third party asserting a lien on the Acquired Assets and shall be free and clear of any such lien.  Notice of the amount sought, including an itemization of the expenses, shall be provided to the Debtors, counsel for the Creditors' Committee, and the U.S. Trustee.  Absent any objection received with seven (7) days of such notice, the amount requested shall be paid from the escrow or trust account.  In the event of a timely objection, any undisputed amount of the Expense Reimbursement may be paid to Purchaser with the disputed amount continued to be held in escrow pending a Court determination of the amount awarded.

8.      The failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such a party to the granting of the Sale Motion and the Assumption Motion, and to the sale and transfer of the Acquired Assets to Purchaser or the Successful Purchaser, including the assumption and assignment of Executory Contracts and the fixing of the applicable cure costs.

9.      All bidders are deemed to have submitted to the jurisdiction of this Court with respect to all matters related to this Motion, the Sale Motion, and the Assumption Motion.

10.      This Court retains jurisdiction with respect to all matters arising from or related to implementation of this Order.

{00225972:2}

ORDER APPROVING BIDDING PROCEDURES, OVERBID
PROTECTIONS AND EXPENSE REIMBURSEMENTS, AND
FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Exhibit 2 - Page 5 of 15
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

11.      As provided by Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for 14 days after the entry thereof and shall be effective and enforceable immediately on its entry on the docket.

12.      Unless otherwise specified, all time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

###

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

PRESENTED BY:

MOTSCHENBACHER & BLATTNER LLP


By:/s/Nicholas J. Henderson
     Nicholas J. Henderson, OSB #074027
     Of Attorneys for Debtor-in-Possession
     Karamanos Holdings, Inc.


**First Class Mail:**

| | | |
|---|---|---|
| Sunshine Dairy Foods Management, LLC c/o Boverman and Assoc., LLC 11285 SW Walker Rd. Portland, OR 97225 Attention: Dan Boverman | Valley Falls Farm, LLC c/o Bryan P. Coluccio, V.P. and General Counsel Keystone-Pacific, LLC 18555 SW Teton Avenue Tualatin, OR 97062 (Un. Sec. Cred. Comm. Chairperson) | Sorrento Lactalis, Inc. c/o Phillips Lytle LLP Attn: Angela Z. Miller 125 Main Street Buffalo, NY 14203 |
| Karamanos Holdings, Inc. Attn:  Norman Davidson, III 630 West Duarte Rd., #208 Arcadia, CA 91007 | Scott Laboratories Inc. Attn:  Jill Skoff, Accting Assistant PO Box 4559 Petaluma, CA  94955 | **Electronic Mail:** The foregoing was served on all CM/ECF participants through the Court's Case Management/ Electronic Case File system. |

ORDER APPROVING BIDDING PROCEDURES, OVERBID
PROTECTIONS AND EXPENSE REIMBURSEMENTS, AND
FORM AND MANNER OF NOTICE OF BIDDING PROCEDURES

Motschenbacher & Blattner LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: 503-417-0500
Fax: 503-417-0501
www.portlaw.com

Exhibit 2 - Page 6 of 15
Case 18-31644-pcm11    Doc 572    Filed 11/30/18

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| In re | Bankruptcy Case Nos. |
| Sunshine Dairy Foods Management, LLC, and | 18-31644-pcm11 (Lead Case) |
| Karamanos Holdings, Inc. | 18-31646-pcm11 |
| | **NOTICE OF BIDDING PROCEDURES** |
| Debtors-in-Possession. | |

These bidding procedures (the "Bidding Procedures") have been approved by an order of the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court") entered on _____, 2018 [Docket No. ____] (the "Bidding Procedures Order") in the above-captioned jointly administered Chapter 11 cases (the "Chapter 11 Cases") of Sunshine Dairy Foods Management, LLC ("Sunshine") and Karamanos Holdings, Inc. ("KHI") (collectively, the "Debtors").

1.     These Bidding Procedures set forth the process by which Karamanos is authorized to conduct a bidding process and auction (the "Auction") for the sale the ("Sale") of certain assets (the "Acquired Assets") on the terms substantially set forth in the Real Estate Purchase and Sale Agreement, dated as of November 27, 2018 and attached as Exhibit 1 to KHI's Motion for Approval of Bidding Procedures, Overbid Protections and Expense Reimbursements, and Form and Manner of Notice of Bidding Procedures (the "PSA"), by and among KHI and NBP Capital, LLC (the "Stalking Horse Bidder"). The Acquired Assets consist of the assets described in **Exhibit A** attached hereto.

The Sale of the Acquired Assets will be implemented pursuant to the terms and conditions of the PSA, as the same may be amended pursuant to the terms hereof, subject to the receipt of higher and otherwise better bids in accordance with these Bidding Procedures. Please take notice that all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the PSA.

> **Copies of the Bidding Procedures Order, the PSA, and other documents related thereto are available upon request to KHI's counsel, by telephone at (503) 417-0500, or by e-mail at mperry@portlaw.com**

**A.     Approval of Stalking Horse Bid Protections.**

The Bidding Procedures Order approved, among other things, a reimbursement of all reasonable costs and expenses of Stalking Horse incurred in connection with Stalking Horse Bidder's efforts to purchase the Acquired Assets and in negotiating and consummating the transactions contemplated by the PSA (including, without limitation, the fees and expenses of

counsel), up to $225,000 (the "Expense Reimbursement").  The Expense Reimbursement is payable to the Stalking Horse Bidder upon the earlier of KHI entering into an agreement to consummate, or consummating, an Alternative Transaction, as defined in the PSA.

**B.       Participation Requirements.**

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person (other than the Stalking Horse Bidder) interested in submitting a Bid (a "Potential Bidder") must, on or before _____, **2018 at __:__ _.m.** (Pacific Time) (the "Bid Deadline") deliver (unless previously delivered) the following documents along with an offer for the Acquired Assets in accordance with Section D below (the "Bid Documents"):

  **a.** an executed confidentiality agreement on terms reasonably acceptable to the Debtors and containing terms in the aggregate no less favorable to the Debtors in any material respect (other than with respect to the effective periods and the non-disclosure and non- solicitation provisions contained therein, all of which terms shall be commercially reasonable) than those contained in the confidentiality agreement by and among the Stalking Horse Bidder and  the Debtors (the "Confidentiality Agreement"); and

  **b.** proof by the Potential Bidder of its financial capacity to close a proposed transaction, as required by this Notice, which may include current unaudited or verified financial statements of, or verified non-contingent financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which must be satisfactory to KHI.

The Bid Documents shall be delivered to the following parties (collectively, the "Notice Parties"):

| Debtors | Counsel for Sunshine |
|---|---|
| Karamanos Holdings, Inc.<br>Sunshine Dairy Foods Management, LLC<br>c/o Norman Davidson III<br>630 West Duarte Road, #208<br>Arcadia, California 91007 | Douglas R. Ricks<br>Vanden Bos & Chapman LLP<br>319 SW Washington St., Ste. #520<br>Portland, OR 97204 |
| **Counsel for Karamanos** | **Debtor Contact** |
| Nicholas J. Henderson,<br>Motschenbacher & Blattner LLP<br>117 SW Taylor St., Suite 300<br>Portland, OR 97204 | Sunshine Dairy Foods Management, LLC<br>c/o Daniel J. Boverman, CTP, Chief Restruct. Officer<br>Boverman & Associates, LLC<br>11285 SW Walker Rd<br>Portland, OR 9725 |

Within forty-eight (48) hours after a Potential Bidder delivers the Bid Documents, KHI shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Bid Documents so that the Potential Bidder may conduct a due diligence review with respect to the Acquired Assets. Only those Potential Bidders that have submitted acceptable Bid Documents (each, an "Acceptable Bidder") may submit bids. The Stalking Horse Bidder shall at all times be deemed an Acceptable Bidder.

### C.       Access to Due Diligence.

Only Acceptable Bidders shall be eligible to receive due diligence and access to additional non- public information. KHI shall provide to each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, which information shall be commensurate with that information given to the Stalking Horse Bidder.  To the extent KHI provides any information to any Acceptable Bidder that they had not previously provided to the Stalking Horse Bidder, KHI shall promptly provide such information to the Stalking Horse Bidder.  The due diligence period will end on the Bid Deadline (as defined herein) and KHI shall have no obligation to furnish any due diligence information after the Bid Deadline.

In connection with the provision of due diligence information to Acceptable Bidders, KHI shall not, except with respect to the Acquired Assets, furnish any other confidential information relating to the Debtors, the Debtors' assets or liabilities, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives to the extent provided in the applicable Confidentiality Agreement.  Debtor shall provide to Stalking Horse Bidder any due diligence information provided to Acceptable Bidders that was not previously provided to Stalking Horse Bidder.

KHI along with its advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided, however,* KHI may decline to provide such information to Acceptable Bidders who, in KHI's reasonable business judgment have not established that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate their Bid. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

Each Acceptable Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets and liabilities that are the subject of the Auction prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise regarding the Acquired Assets or liabilities, or the completeness

---

**The Debtors have designated Daniel J. Boverman to coordinate all reasonable requests for additional information and due diligence access.**

of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or the PSA. Neither the Debtors nor any of their employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors or professionals are responsible for, and shall bear no liability with respect to, any information obtained by Acceptable Bidders in connection with the Sale.

**D.    Bid Requirements.**

        To be eligible to participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder) must, by the Bid Deadline, deliver to (i) the Debtors, (ii) their counsel and (iii) the Debtor Contact, which shall be shared with the Stalking Horse Bidder within one (1) business day following receipt thereof, a written, irrevocable offer that must be determined by the Debtors to satisfy each of the following conditions:

a.    **Bidder Identity and Authorization.** Each Bid must fully disclose the identity of each entity that will be participating in such bid and the name of any affiliates, insiders, or former insiders of the Debtors that participated in submitting the bid, including any proposed designee(s). Further, each Bid must provide written evidence that the Acceptable Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its bid and execution and delivery of the necessary transaction documents, or a representation that no such authorization and approval is required.

b.    **Minimum Bid Amount.** The minimum opening bid from any Acceptable Bidder must include a cash purchase price that is at least $475,000 (*i.e.*, the sum of the maximum Expense Reimbursement and an initial bid increment of $250,000) greater than the cash purchase price set forth in the PSA;

c.    **Bid Deposit.** Each Bid (other than the Stalking Horse Bid) must be accompanied by a cash deposit the greater of $857,500 or 10% of the proposed gross purchase price (the "Good Faith Deposit"), which shall be sent to counsel to the Debtors by wire transfer, which amount shall be deposited in an interest-bearing account;

d.    **Good Faith Offer.** Each Bid must constitute a good faith, bona fide offer to purchase the Acquired Assets;

e.    **Same or Better Terms**. Each Bid must be accompanied by clean and duly executed transaction documents, along with a copy of the PSA that is marked to reflect the amendments and modifications from such agreement, which modifications may not be materially more burdensome to KHI than the PSA or inconsistent with these Bidding Procedures;

f.    **Alternative Transactions**. KHI may consider a bid proposing a transaction other than a sale as set forth in the PSA so long as such bid (i) proposes a transaction that would close substantially in the same time frame as the Initial Bid; and (ii) is not subject to or conditioned upon any financing contingencies or the outcome of due diligence. KHI reserves the right to aggregate separate bids in determining whether

one or more of a combination of bids, in the aggregate, constitute a higher or otherwise better offer;

**g.**    **No Contingencies.** A Bid must not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, (iii) the outcome or completion of a due diligence review by the Acceptable Bidder; and/or (iv) any third-party consents;

**h.**    **Irrevocable.** Each Bid must remain irrevocable until the closing of the Successful Bid (as defined below);

**i.**    **Joint Bids.** KHI will be authorized to approve joint Bids in KHI's exercise of its reasonable good faith business judgment on a case-by-case basis, subject to Section 363(n) of the Bankruptcy Code;

**j.**    **Adequate Assurance Information.** Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the satisfaction of the Debtors, following consultation with their advisors, that such Acceptable Bidder (i) has the financial wherewithal and ability to consummate in the Sale of the Acquired Assets and the assumption of liabilities as set forth the PSA, including payment of any cure amount that will be paid by the purchaser with respect to any contract that may be assigned with respect to the Sale. The Bid shall also identify a contact person that counterparties to any lease or contract may contact to obtain additional Adequate Assurance Information;

**k.**    **No Fees.** The Bids must not be subject to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

**l.**    **Jurisdiction.** Each bidder consents to the jurisdiction of the Bankruptcy Court as to all matters and disputes arising out of or related to the Bid, the Auction, the Sale, and all related matters.

## E.    Qualified Bids.

Bids, or a combination of one or more Bids, fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders."

Within _____ (__) days after the Bid Deadline, KHI shall determine which Acceptable Bidders are Qualified Bidders after consultation with their advisors and will notify the Acceptable Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. Any Bid that is not deemed a "Qualified Bid" shall not be considered by KHI.

The Stalking Horse Bidder shall be deemed to be a Qualified Bidder. The PSA submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, qualifying the Stalking Horse Bidder to participate in the Auction.

**F.     Bid Deadline.**

Qualified Bids must be received by each of the Debtors, their counsel, and the Debtor Contact, in each case so as to be actually **received no later than the Bid Deadline of _____, 2018 at \_\_:\_\_ \_.m. (prevailing Pacific Time).**

**G.     Evaluation of Qualified Bids.**

Prior to the Auction, KHI shall evaluate Qualified Bids and, in consultation with its advisors, identify the Qualified Bid that is, in KHI's judgment, the highest or otherwise best bid (the "Starting Bid"). Within 24 hours of such determination, but in no event later than five (5) business days prior to the date of the Auction, KHI shall notify the Stalking Horse Bidder and the other Qualified Bidders as to which Qualified Bid is the Starting Bid. KHI shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**H.     No Qualified Bids.**

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the PSA will be deemed the Successful Bid (as defined herein) and KHI will pursue entry of an order by the Bankruptcy Court approving the PSA and authorizing the Sale of the Acquired Assets to the Stalking Horse Bidder at the Sale Hearing.

**I.     Auction.**

If one or more Qualified Bids is received by the Bid Deadline, then KHI shall conduct the Auction with respect to the Acquired Assets.  The Auction shall commence on _____, 2018 at \_\_:\_\_ \_.m. (Pacific Time) at the offices of Motschenbacher & Blattner, LLP, 117 SW Taylor St., Suite 300, Portland, OR 97204, or such later time or other place as the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders upon 24 hours' notice.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures")

    **a.**     the Auction will be conducted openly;

    **b.**     only the Qualified Bidders, including the Stalking Horse Bidder, shall be entitled to bid at the Auction;

    **c.**     the Qualified Bidders, including the Stalking Horse Bidder, shall appear in person or through duly-authorized representatives at the Auction;

    **d.**     only such authorized representatives of each of the Qualified Bidders, the Stalking Horse Bidder, the Debtors, and their respective advisors, shall be permitted to attend the Auction;

**e.**    bidding at the Auction shall begin at the Starting Bid; subsequent Bids at the Auction, including any Bids by Stalking Horse Bidder, shall be made in minimum increments of $100,000 net value to KHI;

**f.**    bidding rounds shall continue until no Qualified Bidder has made a bid during a bidding round, whereupon the last highest and best bid at the close of the immediately preceding round shall, subject to Section J below, be deemed the Successful Bid (as defined below). Bidding rounds will last no longer than 15 minutes, and the bidding round will end if new bids are not communicated by Bidders during that time period;

**g.**    each Qualified Bidder will be informed of the terms of the previous Bids;

**h.**    the bidding will be transcribed or videotaped to ensure an accurate recording of the bidding at the Auction;

**i.**    at the beginning of each round, each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale;

**j.**    absent irregularities in the conduct of the Auction, the Bankruptcy Court will not consider Bids made after the Auction is closed; and the Auction shall be governed by such other Auction Procedures as may be announced by KHI after consultation with its advisors from time to time on the record at the Auction; provided, that, any such other Auction Procedures shall not be inconsistent with any order of the Bankruptcy Court or with the provisions of the PSA with respect to these Bidding Procedures; and

**k.**    Any disputes that arise regarding the Auction shall be resolved by the Bankruptcy Court.

**J.**    **Acceptance of the Successful Bid.**

Upon the conclusion of the Auction (if such Auction is conducted), KHI, in the exercise of its reasonable, good-faith business judgment, shall identify the highest or otherwise best Qualified Bid that in the exercise of their fiduciary duties KHI in good faith believes is materially more beneficial to KHI than the Stalking Horse Bid (the "Successful Bid"), which will be determined by considering, among other things:

**a.**    the number, type and nature of any changes to the PSA as appropriate;

**b.**    the total expected consideration to be received by the KHI;

**c.**    the likelihood of the bidder's ability to close a transaction and the timing thereof; and

**d.**     the expected net benefit to the estates.

The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder".  The Successful Bidder and KHI shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

KHI will present the results of the Auction to the Bankruptcy Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures and (d) consummation of the Successful Bid will provide the highest or otherwise best value for KHI's assets and is in the best interests of KHI's estate.

If an Auction is held, KHI shall be deemed to have accepted a Qualified Bid only when (1) such Qualified Bid is declared the Successful Bid at the Auction and (2) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and entry of the Sale Order approving such Successful Bid.

**K.     Sale Hearing.**

A hearing to consider approval of the Qualified Bid submitted by the Successful Bidder (or to approve the PSA if no Auction is held) (the "Sale Hearing") is presently scheduled to take place on _____, 2018 at __:__ _.m. (prevailing Pacific Time), or as soon thereafter as counsel may be heard, before the Honorable Peter C. McKittrick, United States Bankruptcy Judge in the United States Bankruptcy Court for the District of Oregon, 1001 SW 5th Ave #700, Courtroom # 1, Portland, OR 97204.

**L.     Designation of Back-Up Bidder.**

If for any reason the Successful Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest or otherwise best Bid (the "Back-Up Bidder"), as determined by KHI after consultation with its advisors, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid (the "Back-Up Bid").

KHI will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least twenty-four (24) hours advance notice, which notice will be filed with the Bankruptcy Court; it being understood that nothing herein shall require the Stalking Horse Bidder to be a Back-Up Bidder or its Bid to be a Back-Up Bid. In the event the Stalking Horse Bidder is designated as the Back-Up Bidder, the Stalking Horse Bidder may, at its election, terminate the PSA.  In the event of such termination, and notwithstanding any other provision

in this Notice, Stalking Horse Bidder would not have any liability to Seller, would be entitled to return of its Good Faith Deposit, and would be entitled to the Expense Reimbursement.

Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid shall remain open until the closing of the Successful Bid.

## M.    Expense Reimbursement.

In the event that neither the Successful Bid nor the Back-Up Bid is made by the Stalking Horse Bidder (or the Stalking Horse Bidder elects not to have its bid be the Back-Up Bid), and KHI enters into an agreement to consummate, or consummates, an Alternative Transaction, KHI shall be obligated to pay to the Stalking Horse Bidder the Expense Reimbursement and any other amounts returnable to the Stalking Horse Bidder, in each instance in accordance with the applicable provisions of the PSA.

## N.    Return of Good Faith Deposit.

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the Successful Bid, be credited to the purchase price paid for the Acquired Assets. Subject to Section L, above, if the Successful Bidder fails to consummate the Successful Bid, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, KHI.

The Good Faith Deposit of any unsuccessful Qualified Bidders will be returned within two (2) business days after consummation of the Sale of the Acquired Assets.

The initial $600,000 deposit by the Stalking Horse Bidder will be held in a segregated, interest-bearing account (the "Account") at an escrow company approved by KHI and the Stalking Horse Bidder, and pursuant to escrow instructions reasonably acceptable to both KHI and the Stalking Horse Bidder.  The full amount of the deposit, and any interest thereon, will remain in the account until disbursed pursuant to the terms of the PSA or further order of the Bankruptcy Court.

## O.    Reservation of Rights.

KHI reserves its rights to, in any manner consistent with KHI's fiduciary duties and applicable law, modify these Bidding Procedures in any manner that will best promote the goals of the bidding process (subject to any restrictions set forth in the PSA) or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Acquired Assets (subject to any restrictions set forth in the PSA).

Notwithstanding anything herein or in the Bidding Procedures Order to the contrary, nothing will in any way impair or enhance, alter or otherwise affect any and all rights that any secured lender may have to "credit bid" pursuant to section 363(k) of the Bankruptcy Code or other applicable law.